☐ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Feb 09, 2022
Shanene Frederick
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Google, LLC Location History Data and Identifying information<br>for Google Accounts associated with the responsive Location<br>History data for TARGET LOCATIONS described in<br>Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>Case No.  22-821M(NJ)<br>**Matter No.: 2021R00403** |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A. Over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____2/23/22_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Nancy Joseph_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     2/9/22 @ 4:49 p.m._____     _Nancy Joseph_____
*Judge's signature*

City and state:     Milwaukee, Wisconsin_____     Hon. Nancy Joseph, Magistrate Judge
*Printed name and title*

**Return**

| Case No.:<br>22-821 M(NJ) | Date and time warrant executed:<br>02/10/2022 at   1200 hours | Copy of warrant and inventory left with:<br>Google.com |
|---|---|---|

Inventory made in the presence of :  SA ███████

Inventory of the property taken and name(s) of any person(s) seized:


Digital Media in zip file form

**Certification**


I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:   06/07/2022

ALEXANDER ERLIEN

Digitally signed by ALEXANDER ERLIEN
Date: 2022.06.07 12:47:58 -05'00'

*Executing officer's signature*

Special Agent Alex Erlien
*Printed name and title*

**ATTACHMENT A**
**Property To Be Searched**
**Matter No. 2021R00403**

This warrant is directed to Google LLC and applies to:

(1) Location History data, sourced from information including GPS data and information about visible wi-fi points and Bluetooth beacons transmitted from devices to Google, reflecting devices that Google calculated were or could have been (as indicated by margin of error, *i.e., "*maps display radius") located within the geographical region bounded by the latitudinal and longitudinal coordinates, dates, and times below ("Initial Search Parameters"); and

(2) Identifying information for Google Accounts associated with the responsive Location History data.

**Initial Search Parameters (TARGET LOCATIONS)**

**First Time-Frame and Location (TARGET LOCATION A):**

- Date: January 10, 2022

- Time Period: 07:01:30 P.M to 7:02:59 P.M.

- Target Location: Geographical area identified as:



**Geofence points for search warrant:**

Point 1: 43.064586, -87.912563

Point 2: 43.064586, -87.912670

Point 3: 43.063973, -87.912670

Point 4: 43.063973, -87.912563

## Second Time-Frame and Location (TARGET LOCATIONS B):

- Date: January 21, 2022

- Time Period: 2:18:00 P.M. – 2:21:00 P.M.

- Target Location: Geographical area identified as:



**Geofence points for search warrant:**

Point 1: 43.022834, -87.947984

Point 2: 43.022834, -87.948091

Point 3: 43.022700, -87.948091

Point 4: 43.022700, -87.947984

## Third Time-Frame and Location (TARGET LOCATION C):

- Date: January 21, 2022

- Time Period: 12:29:15 P.M. to 12:32:59 P.M.  (CST)

- Target Location:   Geographical area identified as:



**Geofence points for search warrant:**

Point 1: 43.064406, -87.912503

Point 2: 43.064406, -87.912742

Point 3: 43.063973, -87.912742

Point 4: 43.063973, -87.912503

**ATTACHMENT B**
**Particular Items to Be Seized**
**Matter No. 2021R00403**

## I.      Information to be disclosed by Google

The information described in Attachment A, via the following process:

1.      Google shall query location history data based on the Initial Search Parameters specified (*three different time-frames and locations*) in Attachment A.  For each location point recorded within the Initial Search Parameters, and for each location point recorded outside the Initial Search Parameters where the margin of error (*i.e.*, "maps display radius") would permit the device to be located within the Initial Search Parameters, Google shall produce to the government information specifying the corresponding unique device ID, timestamp, location coordinates, display radius, and data source, if available (the "Device List").

2.      The government shall review the Device List and identify to Google the devices about which it seeks to obtain Google account identifier and basic subscriber information.  The government may, at its discretion, identify a subset of the devices.

3.      Google shall disclose to the government identifying information, as defined in 18 U.S.C. § 2703(c)(2), for the Google Accounts associated with each device ID appearing on the Device List about which the government inquires.

## II.      Information to Be Seized

All information described above in Section I that constitutes evidence of violations of 21 Title 21, United States Code, Sections 841, 846 and 856 have been committed by Alex WEDDLE, Carlos PEREZ-RAMIREZ, Janicia MACK-HOWARD, Marisela OBREGON, Xzayvier WEDDLE, Gerald JONES, Lemar HOWZE, and other identified and unidentified subjects.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Feb 09, 2022
Shanene Frederick
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
 )
Google, LLC Location History Data and Identifying information for )
Google Accounts associated with the responsive Location History )
data for TARGET LOCATIONS described in Attachment A )

Case No. 22-821M(NJ)

**Matter No.: 2021R00403**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A. Over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841, 846 and 856 | Distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances and maintaining a drug-involved premises. |

The application is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

ALEXANDER ERLIEN
Digitally signed by ALEXANDER ERLIEN
Date: 2022.02.09 15:36:03 -06'00'

*Applicant's signature*

ATF SA Alexander Erlien

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone
*(specify reliable electronic means).*

Date: 2/9/22

*Judge's signature*

City and state: Milwaukee, Wisconsin

Hon. Nancy Joseph, Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**MATTER NUMBER 2021R403**

I, Alexander Erlien, a Special Agent (SA) with the Bureau of Alcohol, Tobacco,

Firearms, and Explosives (ATF), being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a warrant to search information

that is stored at premises controlled by Google, an electronic communication service and remote

computing service provider headquartered in Mountain View, California.  The information to be

searched is described in the following paragraphs and in Attachment A.  This affidavit is made in

support of an application for a warrant under 18 U.S.C. § 2703(c)(1)(A) to require Google to

disclose to the government the information further described in Attachment B.  The government

will then review that information and seize the information that is further described in Attachment

B.

2.      I have been a SA with the ATF since September 26, 2018. I was previously

employed as Police Officer for the City of Janesville, Wisconsin for approximately five and a half

years, and prior to that, I was an Officer in the United States Navy for approximately five years. I

have a bachelor's degree in philosophy from the University of Wisconsin – Madison. I have been

involved in numerous investigations involving violations of firearms laws, drug trafficking, human

trafficking, and drug possession, resulting in the arrest of numerous criminal defendants and the

seizure of illegal firearms and illicit controlled substances.

3.      I have received training in the investigation of unlawful possession of firearms and

possession of firearms by prohibited persons, as well as drug trafficking and related offenses. I

have been trained regarding these offenses and has arrested individuals for federal firearms related

offenses, as well as drug trafficking offenses. I have also investigated drug trafficking offenses at the state and federal level, including violations of Title 21, United States Code, Sections 841, 846, and 856. I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media.

4. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

5. I have participated in the execution of numerous search warrants in which weapons, narcotics, and/or evidence of drug trafficking were seized in violation of state and federal laws. I am familiar with the different types and calibers of firearms and ammunition commonly possessed for illegal purposes, as well as the methods used to conduct narcotics trafficking. I have had a variety of formal, informal, and on the job training in the investigation of illegal firearms possession firearms trafficking, and drug trafficking. Additionally, I am familiar with street name(s) of firearms, controlled substances, and respective related topics, as well as has knowledge of the use of money laundering to conceal ill-gotten money.

6.     SA ████████ with the ATF performed various investigative tasks in this matter, including several undercover operations.  SA ████ is employed as a special agent with the ATF and has been since October 2018. SA ████ received extensive training at the Federal Law Enforcement Training Center in Glynco, GA.  SA ████ attended the Criminal Investigator Training Program, as well as ATF's Special Agent Training Program. SA ████ has received training in the investigation of violations of firearms laws, drug trafficking, and drug possession. SA ████ has gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state, and federal law enforcement agencies.  Prior to becoming a special agent with the ATF, SA ████ received a bachelor's degrees from the University of Wisconsin – Eau Claire in the field of Criminal Justice.  I have discussed and participated this investigation with SA ████.

7.     Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

8.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances and maintaining a drug-involved premises, violations of Title 21, United States Code, Sections 841, 846 and 856, have been committed by Alex WEDDLE, Carlos PEREZ-RAMIREZ, Janicia MACK-HOWARD, Marisela OBREGON, Xzayvier WEDDLE, Gerald

JONES, Lemar HOWZE, and other identified and unidentified subjects. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## II.     PROBABLE CAUSE

### A.  DEBRIEF OF CONFIDENTIAL SOURCES

10.    Beginning in August 2021, ATF Special Agents (SAs) and Officers from the Milwaukee Police Department (MPD), hereinafter referred to as "Investigators," began investigating an armed drug trafficking organization (ADTO) operating in the Eastern District of Wisconsin (WI).

11.    On August 23, 2021, SA ███████ along with MPD Officers Evan Domine and Ndiva Malafa met with ATF confidential informant (CI) #1. During the debrief of CI #1, CI #1 stated he/she had information regarding an individual known to CI #1 as "A1." Investigators know from knowledge obtained over the course of other law enforcement activities and investigations that Alex WEDDLE, utilizes the nickname "A1." CI #1 stated he/she had known "A1" for several years and has known "A1" to sell narcotics during the entirety of their relationship.

12.    CI #1 explained that "A1" sells both crack cocaine and powder cocaine in the Milwaukee, WI, area. CI #1 stated "A1" sells various quantities of crack cocaine ranging from grams to ounces. CI #1 also stated that when "A1" sells narcotics, "A1" keeps a handgun on his ("A1's") person. CI #1 stated he/she has known "A1" to bring a young "Puerto Rican" male with him ("A1") to act as armed security while "A1" sells narcotics.

13.    The CI #1 stated he/she last spoke with "A1" within the last seven days. CI #1 provided telephone numbers 414-644-6249 and 414-722-0553 as numbers being actively utilized by "A1."

14.     Officer Malafa obtained a photograph of Alex WEDDLE and displayed the photograph to CI #1. CI #1 immediately identified Alex WEDDLE as the individual CI #1 knew as "A1."

15.     CI #1's information is credible and reliable because CI #1 has given information concerning individuals involved in illegal activities, which has been independently verified through this investigation including through controlled drug buys, queries of law enforcement databases, and surveillance. CI # 1 has two felony convictions from April 2014, for possession of narcotic drugs and possess with intent to deliver prescriptions. CI #1 is cooperating with law enforcement in exchange for monetary compensation. CI #1 has no arrests or convictions relating to dishonesty.

16.     At the direction of SA ▮▮▮▮ CI #1 then placed an outgoing call to Alex WEDDLE; however, there was no answer.

17.     After the debrief of CI #1, SA ▮▮▮ spoke to Officer Malafa and Officer Domine about the intelligence MPD had obtained for WEDDLE over the past several years. Officer Malafa stated Alex WEDDLE is known to MPD as an armed drug dealer in Milwaukee, WI. Officer Malafa stated Alex WEDDLE is known by MPD to reside on the east side of Milwaukee and utilizes several different residences to cook, store, and sell crack cocaine. Officer Malafa also stated Alex WEDDLE has been known to utilize rental vehicles to sell narcotics. I know through knowledge, training, and experience those individuals engaged in the sale of narcotics commonly utilize vehicles not registered to the seller, i.e. rental cars, to sell narcotics to avoid detection of the seller's true identity by law enforcement.

18.     On August 25, 2021, Investigators met with a CI #2, who stated they have known "A1" for approximately three years. CI #2 stated he/she has known "A1" to be engaged in the sale

of ounce quantities crack cocaine in the Milwaukee, WI, area. CI #2 stated when "A1" is engaged in the sale of narcotics, "A1" keeps a handgun on his person. CI #2 stated most recently, he/she met with "A1" in a vehicle and observed a pistol in between "A1's" legs. CI #2 stated "A1" resides on the east side of Milwaukee; however, "A1" utilizes several different residences to cook, store, and sell narcotics.

19.     CI #2 stated "A1" possesses numerous telephone numbers, but most recently "A1" has utilized telephone number 414-722-0553. This is the same telephone number provided to Investigators by CI #1.

20.     CI #2's information is credible and reliable because CI #2 has given information concerning individuals involved in illegal activities, which has been independently verified through this investigation including through controlled drug buys, queries of law enforcement databases, and surveillance. CI #2 has no felony convictions but does have multiple misdemeanor convictions including possession of cocaine, resisting or obstructing an officer, and disorderly conduct, domestic abuse. CI #2 has no arrests or convictions relating to dishonesty. CI #2 is cooperating with law enforcement in exchange for monetary compensation.

21.     On August 25, 2021, Investigators queried "Alex WEDDLE" via National Criminal Information Center (NCIC). NCIC identified the following criminal arrests for Alex WEDDLE:

   a.  November 16, 2000 arrest by MPD for first degree sexual assault of child;
   b.  December 11, 2011 arrest by MPD for resisting/obstructing an officer;
   c.  March 10, 2012 arrest by MPD for robbery with threat of force;
   d.  October 6, 2017 arrest by MPD for operating a vehicle without consent;
   e.  October 13, 2017 arrest by MPD for resisting/obstructing an officer;
   f.  January 24, 2021 arrest by Muskego Police Department for possession of cocaine/coca; and
   g.  October 25, 2021 arrest by Milwaukee County Sheriff's Department for felon in possession of a firearm and disorderly conduct.

22.     A query of Alex WEDDLE's criminal history also identified Alex WEDDLE was

convicted on December 3, 2008 for burglary of a building or dwelling, party to a crime, a class F felony, in Milwaukee County Case 2008CF4606.

23.     Additionally, on July 29, 2021, an arrest warrant was issued for Alex WEDDLE out of Waukesha County related to Alex WEDDLE's failure to appear for Waukesha County Case No. 2021CM001240 (Possession of Cocaine/Coca).

24.     On August 24, 2021, at approximately 5:50 P.M., at the direction of Investigators, CI #1 made a recorded call to Alex WEDDLE at telephone No. 414-722-0553. During the call, the CI #1 informed Alex WEDDLE that CI #1 had an associate that was looking to purchase narcotics. WEDDLE responded, "Call me I got you."

## B. UNDERCOVER CONTROLLED BUYS WITH THE ARMED DRUG TRAFFICKING ORGANIZATION

### a. First Undercover Transaction With 414-722-0553 – September 1, 2021

25.     On September 1, 2021, at approximately 9:26 A.M., at the direction of Investigators, CI #1 texted Alex WEDDLE to inform Alex WEDDLE that CI #1's associate, SA ███ working undercover, wanted to purchase a "ball" later that day. I know from knowledge, training, and experience that "ball" is commonly used in street vernacular when referring to 3.5 grams of narcotics.

26.     At approximately 10:40 A.M., at the direction of Investigators, CI #1 contacted Alex WEDDLE via telephone number 414-722-0553 and informed Alex WEDDLE CI #1's associate Dwyane, who was in fact SA ███ working undercover, wanted to purchase approximately 3.5 grams of crack cocaine from Alex WEDDLE. CI #1 also informed Alex WEDDLE that SA ███ would be ready to meet Alex WEDDLE at approximately 2:00 P.M. Alex WEDDLE responded, "I'm waiting on your call."

27.     At approximately 2:45 P.M., Investigators met with CI #1 at a staging location. At

this time CI#1 was searched for contraband, of which none was found. Additionally, CI #1 was provided with audio-/video-recording/transmitting devices. SA ████ was equipped with audio-/video-recording/transmitting devices and an amount of pre-recorded ATF buy money.

28. At approximately 2:51 P.M., Alex WEDDLE texted CI #1, "Waiting on your call."

29. At approximately 2:54 P.M., at the direction of ATF SAs, CI #1 called Alex WEDDLE and asked Alex WEDDLE to meet SA ████ at Walmart that was located at 401 E. Capitol Drive, Milwaukee, WI in approximately 20 minutes. Alex WEDDLE responded, "That's perfect."

30. At approximately 3:05 P.M., SA ████ initiated the audio-/video-recording/transmitting equipment. At approximately 3:08 P.M., CI #1 and SA ████ departed the staging location and traveled towards Walmart in an undercover vehicle (UCV). Please note, during the operation, the undercover Investigators were followed by a designated cover team.

31. At approximately 3:18 P.M., at the direction of Investigators, CI #1 called Alex WEDDLE and informed Alex WEDDLE that his associate, SA ████ would soon be arriving at Walmart. Alex WEDDLE informed CI#1 that Alex WEDDLE would be arriving in "four minutes."

32. At approximately 3:20 P.M., SA ████ and CI #1 arrived at Walmart and parked in the northeast corner of the parking lot. At approximately 3:27 P.M., CI #1 called Alex WEDDLE and informed Alex WEDDLE that CI #1 was waiting for Alex WEDDLE at Walmart. Alex WEDDLE informed CI #1 that Alex WEDDLE was approximately "two minutes" away from Walmart. Alex WEDDLE then asked CI#1 to meet Alex WEDDLE at the "Gamestop on Richards." The Gamestop store referenced by Alex WEDDLE was across the street from Walmart.

33. After the call was ended, CI #1 and SA ████ drove across the street and parked

in the Gamestop parking lot.

34. At approximately 3:36 P.M., Alex WEDDLE texted CI #1 to inform CI #1 that Alex WEDDLE was "pulling up" and would be in a "red Altima."

35. At approximately 3:41 P.M., SA ███ observed a red, four-door Nissan Altima, bearing WI license plate "AHS3102" enter the Gamestop parking lot from Richards Street. As the red Altima approached CI #1 and SA ███ SA ███ observed the vehicle was occupied by three black males. The red Altima then parked in front of SA ███ and CI #1, who were standing outside the UCV. SA ███ and CI #1 then walked up to the red Altima and SA ███ entered the car and sat in the rear driver-side seat. Please note, CI #1 did not enter Alex WEDDLE's vehicle at any time.

36. Upon entering the vehicle, SA ███ immediately identified the individual in the rear-passenger side seat as Alex WEDDLE. SA ███ identified the individual as Alex WEDDLE from having previously examined WI Department of Transportation (DOT) photographs of Alex WEDDLE.

37. Additionally, SA ███ smelled an odor of burnt marijuana and observed the front-seat passenger, who was later identified as Carlos PEREZ-RAMIREZ, smoking a suspected marijuana blunt (Figure 1). SA ███ also later identified the driver of the vehicle as Lemar HOWZE (Figure 2). Please note, while SA ███ was in the Nissan, HOWZE actively looked around Gamestop's parking lot as well as other nearby parking lots. SA ███ understood HOWZE's actions to be indicative of HOWZE serving as a "lookout" (for law enforcement and/or potential robbers). SA ███ knows through training and experience that ADTOs that sell narcotics via mobile dealing (*selling narcotics from vehicles*) often travel in groups of two or more individuals, with each individual fulfilling a designated role (i.e., lookout, armed security, dealer,

etc.).


*(Figure 1)*
*Right: Screenshot from the recordings of the front-passenger, later identified as Carlos PEREZ-RAMIREZ, smoking a suspected marijuana blunt.*


*(Figure 2)*
*Screenshot from the recordings of the driver, later identified as Lemar HOWZE, as he examines Gamestop's parking lot.*

38.     SA ███ then exchanged greetings with the vehicle's occupants and observed Alex WEDDLE had an iPhone placed in the rear-middle seat as he spoke with an unknown female on speakerphone. Alex WEDDLE then ended the call and asked SA ███ "What you wanna do, a ball (3.5 grams)?"

39.     Alex WEDDLE then reached across SA ███ and stuck his hand inside the seat pocket behind the driver's seat. Alex WEDDLE removed a digital scale from the seat pocket and presented a clear plastic bag containing a large amount suspected crack cocaine. Alex WEDDLE then placed the scale on the rear-passenger door frame and began breaking off small pieces of suspected crack cocaine from the larger piece within the clear plastic bag. As Alex WEDDLE broke the smaller pieces off, Alex WEDDLE placed them on the digital scale.

40.     At approximately 3:41 P.M., as Alex WEDDLE weighed the suspected crack cocaine, Alex WEDDLE handed the iPhone that was placed in the rear-middle seat to the front passenger. Alex WEDDLE then instructed the front passenger, PEREZ-RAMIREZ, to enter SA ███ information into the phone when he stated, "Lil bro, take this number down, put it in the phone." SA ███ then provided PEREZ-RAMIREZ with SA ███ cell phone number. Complying with Alex WEDDLE's request, PEREZ-RAMIREZ then entered SA ███ name and number into the phone's contacts and called SA ███ so SA ███ could have Alex WEDDLE's number. Immediately after PEREZ-RAMIREZ placed the outgoing call to SA ███ SA ███ received an incoming call from 414-722-0553.

41.     At approximately 3:42 P.M., Alex WEDDLE handed SA ███ two pieces of crack cocaine without packaging. SA ███ asked Alex WEDDLE if Alex WEDDLE had a bag for SA ███ to package the suspected crack cocaine. Alex WEDDLE stated that he did not have a bag

available for SA ▮▮▮ to use. SA ▮▮▮ then placed the suspected crack cocaine in his pocket and asked Alex WEDDLE what SA ▮▮▮ owed Alex WEDDLE for the suspected crack cocaine. WEDDLE responded, "225." SA ▮▮▮ then counted $240 of the pre-recorded funds and provided them to Alex WEDDLE. SA ▮▮▮ paid Alex WEDDLE more than he requested due to a lack of smaller denominations of United States Currency SA ▮▮▮ had available.

42.     Alex WEDDLE then stated, "Make sure you call me bro. This is gonna be the best shit. I'm tellin' you. You gonna call me back and be like 'hey you da man.'" Based on training and experience, SA ▮▮▮ and I understood this to mean Alex WEDDLE was informing SA ▮▮▮ that the suspected crack cocaine Alex WEDDLE had provided to SA ▮▮▮ was high-quality.

43.     At approximately 3:43 P.M., SA ▮▮▮ thanked Alex WEDDLE and Alex WEDDLE stated, "Alright call me bro." SA ▮▮▮ then exited the Altima and walked back to the UCV. SA ▮▮▮ then observed the Altima exit the Gamestop parking lot and drive southbound on Richards Street. After SA ▮▮▮ entered the UCV, CI #1 stated the rear passenger was the individual he/she knew as "A1."

44.     At approximately 3:44 P.M., the undercover personnel departed the Gamestop parking lot in the UCV and traveled to a pre-determined location. At approximately 3:48 P.M., SA ▮▮▮ terminated the audio-/video-recording/transmitting equipment. At approximately 4:05 P.M., the undercover personnel arrived at the pre-determined location and the operation was terminated. At this time, CI #1 was once again searched for contraband, of which none was found.

45.     Upon arriving at the ATF Milwaukee Field Office, Investigators weighed and field-tested the suspected crack cocaine. The substance weighed 2.54 grams (without packaging) and field-tested positive for crack cocaine.

46.     Continuing on September 1, 2021, at approximately 4:31 P.M., at the direction of

Investigators, CI #1 called Alex WEDDLE at 414-722-0553 and informed Alex WEDDLE that the suspected crack cocaine Alex WEDDLE had given SA ██ weighed approximately one gram less than the three and one-half grams SA ██ had agreed to pay for. Alex WEDDLE responded, "Tell him to call me and come down bro. Tell him bring his own scale. I don't think so, but tell him come on bro. I'm a businessman." The call was then ended for an unknown reason and at 4:32 P.M., CI #1 received an incoming call from Alex WEDDLE. Alex WEDDLE reiterated that he did not believe he had given SA ██ less than three and one-half grams. Alex WEDDLE asked CI #1 to have SA ██ call Alex WEDDLE and stated, "I want everyone to be satisfied dealing with me bro."

47.     At approximately 4:37 P.M., SA ██ received a text from Alex WEDDLE's number 414-722-0553 asking for SA ██ to call Alex WEDDLE.

48.     At approximately 5:21 P.M., SA ██ called Alex WEDDLE and explained Alex WEDDLE had sold SA ██ a full gram less than the three and one-half grams SA ██ had paid for. Alex WEDDLE stated he did not think SA ██ was correct; however, Alex WEDDLE invited SA ██ to "come back down" so Alex WEDDLE could provide SA ██ with the gram of crack cocaine SA ██ had been shorted. Alex WEDDLE stated he is a "businessman" and Alex WEDDLE wouldn't do any "sheisty shit." Based on training and experience, in this context, SA ██ and I understood this to mean Alex WEDDLE would not intentionally provide SA ██ less crack cocaine than SA ██ paid for.

49.     SA ██ and Alex WEDDLE then agreed Alex WEDDLE would provide the shorted, one gram, to SA ██ during the next transaction.

**b. Second Undercover Transaction With 414-722-0553 – September 8, 2021**

50.     On September 7, 2021, at approximately 1:52 P.M., SA ██ texted Alex

WEDDLE at 414-722-0553 to inform Alex WEDDLE that SA ██████ would be in Milwaukee the following day to purchase additional amounts of crack cocaine. On the same date, SA ██████ called Alex WEDDLE at 414-722-0553. An unknown male answered SA ██████ call and stated "Yo Carlito ain't around it's his big brother. What you say?" SA ██████ then asked if the individual would be in Milwaukee, WI, the following day. The unknown individual responded, "Yep come on down buddy, I got you, come on down." SA ██████ understood the individual speaking to SA ██████ was explaining PEREZ-RAMIREZ ("Carlito") was not currently working the telephone. Investigators know through knowledge, training, and experience those individuals belonging to an ADTO commonly take turns utilizing a given cellular phone and/or telephone number. The purpose of rotating the controller of the telephone/telephone number allows the ADTO to provide around-the-clock responses to customers seeking narcotics.

51.     At approximately 11:05 A.M., at the direction of Investigators, CI #1 called Alex WEDDLE at 414-722-0553. Upon Alex WEDDLE answering, CI #1 asked, "Is this A1." Alex WEDDLE then responded "Yeah, whats up…" Investigators monitored the audio of the call and recognized the male's voice to be WEDDLE's voice based on the prior recorded undercover contacts with Alex WEDDLE in person and over the telephone.

52.     CI #1 then informed Alex WEDDLE that SA ██████ was seeking to purchase an amount of crack cocaine from Alex WEDDLE later that day. Alex WEDDLE responded, "Tell him (SA ██████ to call me."

53.     On September 8, 2021, at approximately 11:43 A.M., SA ██████ texted Alex WEDDLE at 414-722-0553 to inform him that SA ██████ would be available to purchase crack cocaine later that day. Alex WEDDLE replied at 11:56 A.M., "Ok bet" and "Call when ready."

54.     At approximately 3:02 P.M., SA ██████ called Alex WEDDLE at 414-722-0553 to

inform Alex WEDDLE that SA ███ would be available to meet shortly. An unidentified male, later determined to be PEREZ-RAMIREZ, answered the phone. SA ███ asked if PEREZ-RAMIREZ would be able to meet SA ███ in approximately 20 minutes at Gamestop located at 3907 N Richards Street. The unidentified individual responded, "Yeah that's cool. Come on."

55.     At approximately 3:03 P.M., SA ███ departed the operation's staging location and traveled towards Gamestop in an undercover vehicle (UCV). Please note, SA ███ was equipped with audio-/video-recording/transmitting equipment and an amount of ATF funds. At approximately 3:17 P.M., SA ███ activated the recording equipment.

56.     At approximately 3:20 P.M., SAs ███ arrived Gamestop. At approximately 3:21 P.M., SA ███ texted 414-722-0553 that SA ███ had arrived at Gamestop. At approximately 3:26 P.M., SA ███ received a response from 414-722-0553: "Ok pulling up."

57.     At approximately 3:31 P.M., SA ███ observed a black Kia sedan bearing Illinois (IL) license plate "CN95593" pull into the parking lot of Aldi, which was directly north of the UCV. The black Kia then parked in front of the UCV and honked its horn. As the Kia was in the process of parking, SA ███ identified the vehicle was being operated by PEREZ-RAMIREZ, the vehicle's sole occupant.

58.     SA ███ then exited the UCV and walked over to PEREZ-RAMIREZ's vehicle and entered the front passenger seat. Upon entering PEREZ-RAMIREZ's vehicle, SA ███ observed PEREZ-RAMIREZ (Figure 3).   PEREZ-RAMIREZ was holding a clear Ziploc bag containing a large amount of suspected crack cocaine.

59.     SA ███ then greeted PEREZ-RAMIREZ and asked if Alex WEDDLE had informed PEREZ-RAMIREZ that Alex WEDDLE owed SA ███ one gram of crack cocaine because the purported crack cocaine Alex WEDDLE sold SA ███ on September 1, 2021, was

approximately one gram short of the three and one-half grams SA  had paid for. PEREZ-RAMIREZ responded, "Nmm Nmm. He (WEDDLE) didn't tell me nothing." SA ▮▮▮▮ then asked PEREZ-RAMIREZ to call Alex WEDDLE so Alex WEDDLE could confirm what SA ▮▮▮▮ had just told PEREZ-RAMIREZ. PEREZ-RAMIREZ stated he had just tried calling Alex WEDDLE and explained, "I just tried to call him for somebody else he didn't answer."


*(Figure 3)*
*Screenshot from the recordings of PEREZ-RAMIREZ seated in the driver's seat of the black Kia.*

60.　SA ▮▮▮▮ then asked PEREZ-RAMIREZ how much crack cocaine SA ▮▮▮▮ could purchase for $500. PEREZ-RAMIREZ responded, "A little more than seven." Please note, in this context, SA ▮▮▮▮ understood this to mean for $500, SA ▮▮▮▮ could purchase approximately seven grams of crack cocaine, which is approximately one-quarter of one ounce.

61.　PEREZ-RAMIREZ then placed a black digital scale on the driver-side floorboard and began weighing the purported crack cocaine (Figure 4). SA ▮▮▮▮ asked PEREZ-RAMIREZ if the seven grams PEREZ-RAMIREZ was weighing included the extra gram that was owed to SA ▮▮▮▮ by Alex WEDDLE. PEREZ-RAMIREZ responded, "I told you he aint tell me nothin, bro, so I can't. I gotta wait for him. If he say he gonna give it to you, he gonna give it to you, just gotta

wait on him… We don't do business like that."

62.    PEREZ-RAMIREZ then reiterated he was waiting for Alex WEDDLE to call him back and PEREZ-RAMIREZ needed to speak to Alex WEDDLE prior to giving SA ▮▮▮ the additional gram.



*(Figure 4)*
*Screenshot from the recordings showing PEREZ-RAMIREZ removing small pieces from the clear Ziploc bag, which he then placed on a black digital scale by his feet.*

63.    At approximately 3:33 P.M., PEREZ-RAMIREZ received an incoming video-call from PEREZ-RAMIREZ's telephone contact, "Bae." PEREZ-RAMIREZ answered the call and exchanged greetings with a female, who he verbally referred to as "Bae." Please note, when PEREZ-RAMIREZ answered the incoming video call, SA ▮▮▮ observed the video-caller on PEREZ-RAMIREZ's cell phone. SA ▮▮▮ immediately identified the caller as Marsiela OBREGON from having previously examined WI DOT photographs of OBREGON.

64.    OBREGON and PEREZ-RAMIREZ then discussed PEREZ-RAMIREZ meeting with an insurance adjuster who would assess damage that had been done to OBREGON's vehicle

as well as injuries PEREZ-RAMIREZ had incurred from an automobile accident. Investigators understood this conversation was in reference to OBREGON's vehicle accident which occurred based on September 3, 2021 based on other MPD reports and body camera.

65.     As PEREZ-RAMIREZ spoke with OBREGON, he picked up the digital scale, which held the crack cocaine being purchased by SA ▮▮▮ and placed it on the center console, so SA ▮▮▮ could observe the weight, approximately 6.97 grams. SA ▮▮▮ then placed his undercover digital scale on the center console and transferred the suspected crack cocaine from PEREZ-RAMIREZ's scale to his own. After transferring the substance to his scale, SA ▮▮▮ observed the weight of the suspected crack cocaine was approximately 6.95 grams. After weighing the substance, SA ▮▮▮ reached down and grabbed an empty small green bag. SA ▮▮▮ asked PEREZ-RAMIREZ if SA ▮▮▮ could use the bag to package the suspected crack cocaine, to which PEREZ-RAMIREZ agreed. SA ▮▮▮ then transferred the purported crack cocaine into the green bag. SA ▮▮▮ then removed an amount of ATF funds from his pocket and counted $500, SA ▮▮▮ provided the $500 to PEREZ-RAMIREZ in exchange for the suspected crack cocaine.

66.     PEREZ-RAMIREZ then stated he would soon contact SA ▮▮▮ after he spoke with Alex WEDDLE. PEREZ-RAMIREZ further explained if Alex WEDDLE confirmed Alex WEDDLE owed SA ▮▮▮ an additional gram of crack cocaine, PEREZ-RAMIREZ would call SA ▮▮▮ to come back to obtain the narcotics. After explaining SA ▮▮▮ needed to leave Milwaukee at that time, PEREZ-RAMIREZ stated, in substance, that he would have the additional gram of crack cocaine for SA ▮▮▮ the next time they met.

67.     At approximately 3:37 P.M., SA ▮▮▮ thanked PEREZ-RAMIREZ, exited the Kia, and walked back to the UCV. SA ▮▮▮ then observed PEREZ-RAMIREZ drive eastbound towards Richards Street until he was out of sight.

68.     Continuing on September 8, 2021, Investigators weighed and field-tested the suspected crack cocaine. The substance weighed 6.95 grams without packaging and field-tested positive for crack cocaine.

69.     On September 9, 2021, SA ███ spoke with Avis Budget Group in regard to the Kia that was operated by PEREZ-RAMIREZ the previous day. Per Avis, the vehicle had been rented by OBREGON on September 4, 2021.

70.     On September 9, 2021, at the direction of Investigators, CI #1 contacted Alex WEDDLE at telephone No. 414-722-0553. Upon the call being connected, CI #1 asked if the individual who answered the phone was "A1," which Alex WEDDLE subsequently confirmed. CI #1 then stated that SA ███ was upset that PEREZ-RAMIREZ did not provide SA ███ with the one gram of suspected crack cocaine that Alex WEDDLE owed SA ███ from the narcotics transaction which occurred on September 1, 2021.

71.     Alex WEDDLE then told CI #1, "I didn't have the phone yesterday bro, that was 'Lil Bro' workin. I didn't have the phone yesterday that was Lil Bro workin. Lil Bro didn't know nothin about that. He didn't know nothin about that." Based on my training and experience, I know that members of ADTOs commonly take turns, or "shifts," operating a telephone and/or telephone number used for the sale of controlled substances. After Alex WEDDLE stated, 'Lil Bro' did not know about the previous shortage, a faint voice was heard in the background saying "I told him (SA ███ that."

72.     CI #1 then asked Alex WEDDLE to contact SA ███ to explain the misunderstanding. After CI #1 finished speaking with Alex WEDDLE, SA ███ received three calls from 414-722-0553; however, SA ███ did not answer. At approximately 4:32 P.M., SA ███ called 414-722-0553; however, there was no answer.

73. At approximately 5:14 P.M., SA ███ received a call from Alex WEDDLE from 414-722-0553. Alex WEDDLE stated, in substance, that SA ███ needed to "come down" and meet with Alex WEDDLE. SA ███ responded that he could not meet with Alex WEDDLE at that time. SA ███ and Alex WEDDLE then discussed the transaction between PEREZ-RAMIREZ and SA ███ that occurred previous day.

74. Alex WEDDLE stated PEREZ-RAMIREZ did not provide SA ███ with an additional gram because, "He (PEREZ-RAMIREZ) ain't know nothing." Alex WEDDLE then attempted to personally take care of the shortage when he stated, "So that's why I'm telling you to come down."

75. SA ███ asked Alex WEDDLE if he could provide the shorted one gram to SA ███ during a future narcotics transaction. Alex WEDDLE agreed and explained, "We don't do (bad) business like that man. You should already know that. You should've come down again and he'd take care of you. And he told me you put it on the scale. We don't play no games… It was just a misunderstanding." After agreeing to provide the one gram to SA ███ during the next transaction, Alex WEDDLE stated, "I got you, boss, call us."

76. On September 11, 2021, at approximately 10:06 A.M., SA ███ received a call from 414-722-0553; however, SA ███ did not answer. After SA ███ did not answer, SA ███ immediately received a text from the same number stating, "Call me." On September 14, 2021, at approximately 9:31 A.M., SA ███ sent a text to 414-722-0553 stating, "Ay my bad broski didnt even see u hit me. u good?" Approximately one minute later SA ███ received a response stating, "Yeah."

   **c. Third Undercover Transaction and Identification of Second Customer Phone 414-517-5178 – September 17, 2021**

77. On September 15, 2021, at approximately 4:37 P.M., SA ███ received a text

from 414-517-5178 stating, "This a1 we back on this number."

78.     On September 16, 2021, at approximately 11:28 A.M., SA ███ texted 414-517-5178 and stated SA ███ wished to purchase crack cocaine later that day or the following day. At 11:29 A.M., SA ███ received a text from 414-517-5178 stating, "Lol ok bet got u." Based on training, experience and the investigation regarding the ADTO, Investigators believed this was a second drug customer phone that was being utilized by Alex WEDDLE and his ADTO.

79.     On September 17, 2021, at approximately 9:55 A.M., SA ███ texted 414-517-5178 that SA ███ would be coming to meet with Alex WEDDLE later that day. SA ███ received a responds text message at approximately 9:59 A.M, "Call me when here" from 414-517-5178.

80.     On September 17, 2021, at approximately 10:46 A.M., at the direction of Investigators, CI #1 called Alex WEDDLE at 414-722-0553 and informed Alex WEDDLE that CI #1 desired to purchase an amount of crack cocaine from Alex WEDDLE later that day. Alex WEDDLE responded, "Yeah come on." Please note, the purpose of this call was to confirm the identity of the individual who possessed the telephone utilizing telephone 414-722-0553 at that time. Additionally, over the course of the investigation, SA ███ learned that at any given time, the individual operating telephone 414-517-5178 was also responsible for operating telephone 414-722-0553.

81.     On September 17, 2021, at approximately 12:18 P.M., SA ███ equipped with recording equipment and ATF funds departed a pre-determined staging location in an undercover vehicle (UCV) and traveled towards Gamestop, located at 3907 North Richards Street, Milwaukee, WI 53212.

82.     At approximately 12:34 P.M., SA ███ called 414-517-5178 and Alex WEDDLE

answered the call, which SA ▮▮▮ was able to determine based on prior interactions with Alex WEDDLE. SA ▮▮▮ informed Alex WEDDLE that SA ▮▮▮ had arrived at Gamestop. Alex WEDDLE asked SA ▮▮▮ what SA ▮▮▮ was wanting to purchase. SA ▮▮▮ responded that SA ▮▮▮ wanted to purchase a "zip." Based on training and experience, I know a "zip" is common street vernacular used to refer to an ounce of narcotics. Alex WEDDLE responded, "Text me exactly how much you got bro." The call was then disconnected. SA ▮▮▮ immediately called Alex WEDDLE back and asked how much Alex WEDDLE would charge SA ▮▮▮ for an ounce of crack cocaine. WEDDLE responded, "Eighteen Hundred ($1,800)."

83. SA ▮▮▮ then attempted several times to counter Alex WEDDLE's price of $1,800; however, Alex WEDDLE declined each time to reduce the price. Alex WEDDLE explained, "Now if you want me to go make you some bullshit up I can whip you up some bullshit and give it to you but if you want the shit that I got. You know what I'm saying. I don't wanna (*inaudible*)… If you want the shit that I got, you know what I mean." Based on training and experience, SA ▮▮▮ understood this to mean Alex WEDDLE was offering to manufacture an ounce of reduced-quality crack cocaine for a reduced price; however, if SA ▮▮▮ wanted to purchase high-quality crack cocaine, Alex WEDDLE could not offer a reduced price.

84. Once SA ▮▮▮ agreed to purchase the ounce of crack cocaine from Alex WEDDLE for $1,800, Alex WEDDLE stated he was on his way to meet SA ▮▮▮.

85. At approximately 12:41 P.M., SA ▮▮▮ observed a white Kia sedan with dark tint arrive at the Gamestop parking lot and back into a parking stall approximately twenty yards west of the UCV.

86. At approximately 12:45 P.M., SA ▮▮▮ observed a black Kia sedan bearing Illinois (IL) license plate "CN95593" arrive at Gamestop and park directly next to the UCV, in

between the white Kia and the UCV. The black Kia was the same vehicle PEREZ-RAMIREZ operated on September 8, 2021. As the black Kia began to park, SA ▮▮▮▮ observed the vehicle was driven by Alex WEDDLE and PEREZ-RAMIREZ was in the front-passenger seat. In the rear-passenger seat of the Kia was a black male, later identified as Lemar HOWZE. Early in the investigation and during the undercover controlled buys described in this subsection and subsection a, investigators had yet to identify HOWZE and believed that he may have been another individual suspected of participating in the ADTO.

87.     At approximately 12:45 P.M., SA ▮▮▮▮ exited the UCV and walked towards Alex WEDDLE's vehicle. As SA ▮▮▮▮ walked around the back of Alex WEDDLE's vehicle, Alex WEDDLE exited his car and greeted SA ▮▮▮▮ (Figure 5). Alex WEDDLE then instructed SA ▮▮▮▮ to enter the rear-driver-side seat as WEDDLE entered the rear-driver-seat of the white Kia.



*(Figure 5)*
*Screenshot from the recording of* Alex *WEDDLE exiting the black Kia and instructing SA* ▮▮▮▮ *to enter the vehicle. Please note, the white Kia is pictured behind WEDDLE.*

88.     SA ▮▮▮▮ then entered the rear driver-seat of the black Kia and greeted PEREZ-

RAMIREZ and UM1. As SA ███ entered the black Kia, SA ███ observed HOWZE was using a cellular telephone.

89.     At approximately 12:47 P.M., Alex WEDDLE exited the white Kia and immediately re-entered the driver's seat of the black Kia. Alex WEDDLE placed the car in reverse and began backing out of the parking stall. SA ███ then asked where Alex WEDDLE intended to drive and Alex WEDDLE responded, "Nowhere Nowhere."

90.     SA ███ then stated he did not wish to ride with Alex WEDDLE and would rather drive his own vehicle to where Alex WEDDLE intended to go to conduct the transaction. As Alex WEDDLE began to drive, the vehicle doors had locked, preventing SA ███ to exit. After several moments, Alex WEDDLE stopped the car and unlocked the doors, allowing SA ███ to exit black Kia.

91.     As SA ███ walked back towards the UCV, Alex WEDDLE yelled to SA ███ through the rear-passenger window that they had been "sitting out here too long" which was captured on video (Figure 6). SA ███ understood this to mean Alex WEDDLE wanted to move the transaction location due to having been at Gamestop too long, which may have potentially attracted the attention of law enforcement.



*(Figure 6)*
*Screenshot from the recording as Alex WEDDLE (driver's-seat) yelled to SA* ▇
*through the rear-passenger window. Please note, HOWZE is captured in the still-frame*
*seated in the rear-passenger seat.*

92.　　At approximately 12:48 P.M., SA ▇ in his UCV, followed Alex WEDDLE out of the west exit of the Gamestop parking lot and drove a short distance north on North Palmer Street before turning east into the parking lot of a nearby Popeyes. Alex WEDDLE then backed into a parking stall and waited for SA ▇ to walk over to Alex WEDDLE's black Kia. SA ▇ exited the UCV, walked over to Alex WEDDLE's vehicle, and re-entered the rear driver-seat.

93.　　After SA ▇ entered Alex WEDDLE's vehicle, Alex WEDDLE asked SA ▇ if SA ▇ had a pipe, initially referred to Alex WEDDLE as a "piece." SA ▇ responded that he did not possess a pipe and SA ▇ was not a user of crack cocaine. Alex WEDDLE then stated, "You gotta do me a favor bro. You gotta put this on your tongue bro." Alex WEDDLE then turned around and extended his hand towards SA ▇ SA ▇ observed Alex WEDDLE's hand contained a small piece of suspected crack.

94. After SA ██ then declined to put the substance on his tongue, Alex WEDDLE explained that in order for Alex WEDDLE to complete the transaction with SA ██ SA ██ needed to place the suspected crack cocaine on SA ██ tongue. I know through knowledge, training, and experience that drug dealers often make customers consume narcotics to prove they are not law enforcement.

95. At approximately 12:51 P.M., CI #1 called Alex WEDDLE. Please note, after the transaction, SA ██ asked CI #1 why CI #1 had called Alex WEDDLE at that time. CI #1 stated he/she had called to ask Alex WEDDLE to ask if the transaction between Alex WEDDLE and SA ██ occurred.

96. Alex WEDDLE placed the phone on speaker-mode and began speaking with CI #1. Alex WEDDLE then told CI #1 that WEDDLE was uncomfortable selling SA ██ the crack cocaine due to SA ██ purchasing "a whole one." Based on my training, experience, and investigation, I understood this to men an ounce. Alex WEDDLE then hung up the phone and informed SA ██ that Alex WEDDLE was concerned SA ██ may be a law enforcement officer because of the amount of purported cocaine SA ██ was desiring to purchase. HOWZE then demanded SA ██ remove his hat so HOWZE could examine the garment.

97. As HOWZE was demanding SA ██ remove his hat, Alex WEDDLE and PEREZ-RAMIREZ, in escalated tones, explained they had concerns that SA ██ may be a member of law enforcement because SA ██ was wanting to purchase such a large amount of narcotics. PEREZ-RAMIREZ further explained that they, members of their ADTO, do not typically sell more than a "ball" to their customers. Based on my training and experience, I understood this to mean 3.5 grams of a controlled substance.

98. Alex WEDDLE then expressed concerned about the ramifications of being caught

with a large amount of crack cocaine when he stated, "This is ten years. You get caught with this that's ten years. I get caught with it, it's twenty." Based on my training and experience, I understood Alex WEDDLE "ten years" to reference the amount of incarceration that could be enforced by the justice system.

99.     After SA ███ reiterated several times that he was not a member of law enforcement and would not ingest any crack cocaine, Alex WEDDLE handed SA ███ a large amount of purported crack cocaine, which was wrapped inside of a paper receipt. SA ███ then took the substance from Alex WEDDLE and placed it on the cup holder in between SA ███ and HOWZE. After receiving the substance from Alex WEDDLE, SA ███ removed SA ███ undercover digital scale from his pocket, placed it on the center cup holder, and weighed the suspected crack cocaine.

100.    Upon transferring the purported crack cocaine from the receipt paper (packaging) to the scale, the weight of the substance was approximately 27.4 grams. SA ███ then informed Alex WEDDLE the purported crack cocaine provided by Alex WEDDLE was "light." HOWZE then leaned over and examined SA ███ scale. HOWZE then asked why SA ███ was disgruntled about "some tenths." From training and experience, "some tenths" in this context referring to tenths of a gram.

101.    SA ███ responded that SA ███ had been "shorted" the first time SA ███ purchased crack cocaine from Alex WEDDLE and SA ███ did not want to be provided with less crack cocaine than SA ███ had paid for a second time. HOWZE then instructed Alex WEDDLE, "Give him another little." Alex WEDDLE then provided SA ███ with another small piece of purported crack cocaine, which SA ███ subsequently placed on the digital scale. With the addition of the small piece, the weight of the substance was approximately 28 grams without

packaging.

102. SA ████ then grabbed a small, sealable bag, which based on my training and experience is for wrapping papers commonly used to smoke marijuana, from the floorboards in front of him. SA ████ then examined the packaging to ensure it was empty and asked if SA ████ could use the empty packaging to conceal the suspected crack cocaine. PEREZ-RAMIREZ then examined the inside of the packaging to observe it was completely empty and allowed SA ████ use the sealable bag. SA ████ then proceeded to empty the suspected crack cocaine on the digital scale into the packaging. Please note, a small amount of suspected crack cocaine fell onto the car seat and cup holder during the transfer process.

103. SA ████ then counted $1,800 in pre-recorded ATF funds and handed the funds to Alex WEDDLE, who began to count the funds. SA ████ then asked Alex WEDDLE if he had any firearms that were able to be sold to SA ████ Alex WEDDLE explained he did not as things had been "fucked up" and "everyone" was "trying to keep their shit."

104. As Alex WEDDLE was in the process of counting the ATF funds, PEREZ-RAMIREZ repositioned his left arm, which previously blocked SA ████ view of PEREZ-RAMIREZ's lap. This then allowed SA ████ to observe a silver handgun with a silver and rosewood pistol grip on PEREZ-RAMIREZ's lap (Figure 7 and 8). Based on training and experience, SA ████ identified the firearm had characteristics that were identical a Kimber Micro pistol (Figure 9).



*(Figure 7)*
*Screenshot from the recordings capturing the firearm on PEREZ-RAMIREZ's lap.*



*(Figure 8)*
*Screenshot from the recordings capturing the firearm on PEREZ-RAMIREZ's lap.*



*(Figure 9)*
*Stock Photograph taken from Google Images of Kimber Micro.*

105. At approximately 12:59 P.M., after Alex WEDDLE finished counting the funds,

Alex WEDDLE drove SA ███ back to the UCV, which was parked a short distance from Alex WEDDLE's vehicle in Popeyes' parking lot. SA ███ then thanked Alex WEDDLE, PEREZ-RAMIREZ, and HOWZE for the transaction and exited the black Kia. Alex WEDDLE then exited the Popeyes parking lot, turned north on to North Palmer Street, and ultimately traveled eastbound on East Capitol Drive until he was out of sight of SA ███

106.    After the operation was concluded, Investigators weighed and field-tested the suspected crack cocaine. The substance weighed 31.25 grams (with packaging) and field tested positive for crack cocaine.

107.    Continuing on September 17, 2021, following the undercover drug transaction, at approximately 4:13 P.M., Investigators began conducting surveillance at Alex WEDDLE's family members' residence, located at 3268 North 35th Street, Milwaukee, WI, which had also been identified as Alex WEDDLE's possible residence.  Investigators learned of this address after reviewing MPD incident reports involving Alex WEDDLE's family members, who listed the aforementioned address as their permanent residence.

108.    At approximately 4:25 P.M., Investigators observed the black Kia K5 bearing IL plate CN95593 parked on North 35th Street directly in front of the residence, 3268 North 35th Street, facing north.

109.    As Investigators situated their undercover vehicle, they observed the vehicle's front and rear yellow turn signals flash indicated the vehicle was being locked or opened. Investigators were able to observe two black males, who were facing the opposite direction, walk through the gangway and enter the side door associated with 3268 North 35th Street.

110.    At about 4:29 P.M., Investigators observed Alex WEDDLE and HOWZE, wearing the same clothes he had worn during the undercover narcotics operation, exit the side door of the

residence of 3268 North 35th Street. Investigators, utilizing binoculars, observed the handle of a firearm protruding from the front left pant pocket of Alex WEDDLE. An additional handle of a firearm was observed in the front right pant pocket of HOWZE. Both Alex WEDDLE and HOWZE walked west through the gangway towards the black Kia K5. Alex WEDDLE entered the front passenger seat while HOWZE entered the driver's door. The vehicle then turned north on North 35th Street towards West Townsend Avenue.

### d. Telephone Interactions Between SA ███ and Customer Phones 414-722-0553 and 414-517-5178 - Between Third and Fourth Narcotics Transaction

111. On September 18, 2021, at approximately 4:58 P.M., SA ███ texted 414-517-5178, indicating that SA ███ wanted to purchase additional amounts of crack cocaine from Alex WEDDLE and his ADTO. At 5:07 P.M., SA ███ received a text message response, "Ready when you are."

112. On September 24, 2021, at 7:00 A.M., SA ███ texted 414-517-5178 and stated SA ███ would "come down" later that day. On the same date, at 12:56 P.M., SA ███ texted 414-517-5178 to explain SA ███ could not meet that day but would let Alex WEDDLE and/or his associates know when SA ███ planned to come again. At 4:28 P.M., the 414-517-5178 replied, "Cool."

113. On September 30, 2021, at 1:33 P.M., SA ███ received a text from telephone 414-722-0553 stating, "We around." Based on training and experience, Investigators understood this to mean Alex WEDDLE and his associates had an amount of crack cocaine that could be sold at that time.

114. On October 4, 2021, at 7:28 P.M., SA ███ texted telephone 414-517-5178 and asked if SA ███ could meet with Alex WEDDLE and/or his associates the following day. At 7:29 P.M., SA ███ received a reply stating, "Yeah."

115. On October 5, 2021, at 11:46 A.M., SA ██████ texted telephone 414-517-5178 and stated he planned to come into Milwaukee after 3:00 P.M. SA ██████ received a response stating, "K what should I have ready." SA ██████ texted back stating SA ██████ wished to purchase another ounce, referring to crack cocaine, and asked if the price for the ounce would still be $1,800.

116. SA ██████ then received a response at 12:11 P.M., stating, "Yeah unless you want sum bullshit." At 4:13 P.M., SA ██████ texted 414-517-5178, stating SA ██████ was unable to meet that day; however, SA ██████ would meet on another date to purchase the narcotics.

**e. Fourth Undercover Transaction Arranged With 414-517-5178 – October 6, 2021**

117. On October 6, 2021, at approximately 12:48 P.M., SA ██████ texted 414-517-5178 to inform Alex WEDDLE and/or his associates that SA ██████ would be in Milwaukee later that day to purchase an amount of crack cocaine.

118. On October 6, 2021, at approximately 12:57 P.M., SA ██████ called 414-517-5178 and was greeted by PEREZ-RAMIREZ, SA ██████ identified the individual speaking as PEREZ-RAMIREZ from having previous in-person and telephone contacts with PEREZ-RAMIREZ. SA ██████ asked if PEREZ-RAMIREZ could meet SA ██████ in approximately one hour. PEREZ-RAMIREZ did not answer SA ██████ question but proceeded to ask how much crack cocaine SA ██████ wished to purchase. SA ██████ explained he wanted to purchase a "zip", which based on training and experience meant one ounce.

119. At 1:53 P.M., SA ██████ departed the operation's staging location in an undercover vehicle (UCV) and traveled towards Gamestop. SA ██████ was equipped with audio-/video-recording/transmitting equipment and an amount of pre-recorded ATF Funds.

120. At approximately 2:04 P.M., SA ██████ initiated the recording equipment and at 2:05 P.M., SA ██████ arrived at Gamestop's parking lot. After parking the UCV, SA ██████ called

414-517-5178 to notify PEREZ-RAMIREZ that SA ████ had arrived at the meet location. PEREZ-RAMIREZ then stated he was on his way to meet SA ████

121.    At approximately 2:26 P.M., PEREZ-RAMIREZ called SA ████ using telephone number 414-517-5178 and stated PEREZ-RAMIREZ would be arriving "In like three minutes."

122.    At 2:32 P.M., 414-517-5178 texted SA ████ that PEREZ-RAMIREZ was in a "red car." PEREZ-RAMIREZ then sent an immediate follow-up text stating, "Pulling in parking lot." Shortly after receiving the text messages, SA ████ observed a red Nissan Altima with dark tint, bearing "Rosen" auto dealer license plate tags drive into Aldi's parking lot. Aldi is located immediately north of Gamestop, and the businesses' parking lots are separated by a small grass median.

123.    SA ████ then received a call from PEREZ-RAMIREZ using 414-517-5178, during which PEREZ-RAMIREZ stated he had arrived at Aldi. SA ████ then informed PEREZ-RAMIREZ that SA ████ observed PEREZ-RAMIREZ's vehicle and SA ████ would walk over to him. As the Nissan parked in front of the UCV, SA ████ observed PEREZ-RAMIREZ occupied the front passenger seat while OBREGON occupied the driver's seat.

124.    At 2:34 P.M., SA ████ exited the UCV, walked towards the Nissan, and entered the rear driver's-side seat. Upon entering the car, SA ████ was greeted by a small child, who was seated in the rear passenger-side seat. SA ████ recognized the child to be the same child Investigators observed with PEREZ-RAMIREZ and OBREGON at 1437 South 71st Street, West Allis, WI.

125.    After SA ████ greeted the vehicle's occupants, PEREZ-RAMIREZ stated SA ████ caught him at a bad time because he was "out shopping" with his "son" and "wife." PEREZ-RAMIREZ then handed SA ████ a knotted Ziploc-style bag containing an amount of purported

crack cocaine (Figure 10).



*(Figure 10)*
*Screenshot from the recordings showing SA ▮▮▮ receiving the suspected crack cocaine from PEREZ-RAMIREZ.*

126.     SA ▮▮▮ then asked if the amount of purported crack cocaine being provided was in fact one ounce. PEREZ-RAMIREZ responded, "That's the whole. I just, when I went to the house, I grabbed that from bro." PEREZ-RAMIREZ further explained, "I called bro, man like uh Dwayne on his way down here for the same thing. He said man come get it I got it ready for him." I know from information learned over the course of this investigation that PEREZ-RAMIREZ refers to Alex WEDDLE as "bro" and SA ▮▮▮ used the undercover name Dwayne for the investigation. Also based on my training and experience and the conversation between SA ▮▮▮ and PEREZ-RAMIREZ, PEREZ-RAMIREZ's reference to "whole" and "same thing" meant ounce of crack cocaine.

127.     SA ▮▮▮ then asked PEREZ-RAMIREZ why PEREZ-RAMIREZ would not sell SA ▮▮▮ the firearm, referring to the silver and rosewood Kimber Micro brandished during the previous transaction on October 6, 2021 by PEREZ-RAMIREZ. PEREZ-RAMIREZ replied,

"which one?" SA ▮▮▮ then described the firearm as small and silver. PEREZ-RAMIREZ replied, "That's hers" as he nodded towards OBREGON. PEREZ-RAMIREZ then stated, "That's my wife's."

128. OBREGON then reached between the driver's seat and the center console and produced a black Glock pistol with an extended magazine for SA ▮▮▮ to see. OBREGON explained, "This is my other one." OBREGON then handed the pistol to PEREZ-RAMIREZ, who continued to display the firearm for SA ▮▮▮ to observe.

129. SA ▮▮▮ asked PEREZ-RAMIREZ if he had a "hook up" on firearms. PEREZ-RAMIREZ explained OBREGON goes to "the store" to purchase the firearms, which based on my training and experience I believe to mean a licensed gun store. SA ▮▮▮ then asked if SA ▮▮▮ could handle the firearm. PEREZ-RAMIREZ then handed the pistol to SA ▮▮▮ (Figure 11). As PEREZ-RAMIREZ handed the pistol to SA ▮▮▮ OBREGON warned SA ▮▮▮ "There's one up though." In this context, based on my training and experience meat a live round was in the chamber of the gun. SA ▮▮▮ then examined the firearm and observed that the pistol was a Glock 19 pistol. SA ▮▮▮ also identified the magazine could hold up to 30 rounds of 9mm caliber ammunition.

130. SA ▮▮▮ then asked OBREGON and PEREZ-RAMIREZ if the firearm could be purchased. OBREGON indicated she did not want to sell the firearm when she stated, "It's in my name." PEREZ-RAMIREZ also expressed an inability to sell the firearm by stating, "It's in her name."

131. SA ▮▮▮ then asked where SA ▮▮▮ could find an extended magazine to purchase due to extended magazines being difficult to find. PEREZ-RAMIREZ responded, "In the store! In the store! You can walk in the store and buy them!"

132.    After declining to sell the Glock 19, PEREZ-RAMIREZ stated, "I can get you some though" referencing firearms. PEREZ-RAMIREZ then stated he would speak with WEDDLE and they would contact SA ███ when they had firearms available to be sold.

133.    SA ███ then handed the firearm back to PEREZ-RAMIREZ and stated there was more money to be made in selling firearms compared to narcotics. PEREZ-RAMIREZ smiled and stated, "I know I know."



*(Figure 11)*
*Screenshot from the recordings showing SA ███ handing the firearm back to PEREZ-RAMIREZ.*

134.    PEREZ-RAMIREZ then guided the discussion back to the purported crack cocaine transaction and stated, "You said eighteen right?" In this context, SA ███ understood this to mean PEREZ-RAMIREZ was confirming the price for the purported crack cocaine provided to SA ███ was $1,800. SA ███ then counted $1,800 in ATF Funds and handed the Funds to PEREZ-RAMIREZ, who confirmed the amount of money provided was $1,800.

135.    At 2:36 P.M., SA ███ thanked PEREZ-RAMIREZ and began exiting the Nissan. PEREZ-RAMIREZ then shouted to SA ███ "Call us whenever you're ready." SA ███ then walked back to his vehicle and reentered the UCV. SA ███ observed the Nissan drive east towards North Richards Street until the vehicle was out of sight.

136.    After the operation, Investigators weighed and field-tested the suspected crack cocaine. The substance weighed 22.23 grams (with packaging) and field-tested positive for crack

cocaine.

137.    Continuing on October 6, 2021, SA ███ called 414-517-5178. Alex WEDDLE answered the phone and stated, "Yo yo." SA ███ immediately identified the individual speaking as Alex WEDDLE from having previous in-person and telephone contacts with Alex WEDDLE.

138.    SA ███ informed Alex WEDDLE that the purported crack cocaine SA ███ had purchased earlier that day from PEREZ-RAMIREZ was nine grams less than the ounce SA ███ had paid for. Alex WEDDLE attempted to explain the reason for the shortage when he stated, "That's the scale bro."

139.    SA ███ explained SA ███ did not weigh the amount in the car when he was with PEREZ-RAMIREZ, so SA ███ did not realize the shortage until after the transaction had occurred. Alex WEDDLE explained SA ███ had dealt with Alex WEDDLE's "Lil Bro", PEREZ-RAMIREZ, and he, PEREZ-RAMIREZ may not have known about the shortage.

140.    Alex WEDDLE then stated SA ███ should "come in" because Alex WEDDLE would be working "until the morning." Based on training and experience, myself and Investigators understood this to mean Alex WEDDLE and his associates worked the telephone in shifts, and WEDDLE was working the current shift; therefore, Alex WEDDLE would settle the shortage if SA ███ came to pick up the nine grams at that time

141.    After SA ███ explained he was unable to meet Alex WEDDLE at that time, Alex WEDDLE explained SA ███ was now "ten up however you wanna do it." Based on training, experience, and the investigation in this matter, Investigators understood "ten up" to mean Alex WEDDLE owed SA ███ ten grams of crack cocaine, which would be provided to SA ███ during the next transaction.

142.    Alex WEDDLE then stated SA ███ would only deal with Alex WEDDLE

directly during future transactions in an effort to prevent further complications. WEDDLE explained, "When you call if he (PEREZ-RAMIREZ) got the phone he gonna have you call me."

###### f. Fifth Undercover Transaction Arranged With 414-722-0553 and 414-517-5178 to Obtain Shorted Crack Cocaine - November 1, 2021

143.    On October 25, 2021, SA ███ communicated with 414-722-0553 and 414-517-5178 via text message and telephone calls for the purpose of obtaining nine grams of crack cocaine from Alex WEDDLE and his associates, which was a debt owed to SA ███ from prior undercover purchases, first transaction from September 1, 2021 and fourth transaction from October 6, 2021.

144.    On October 25, 2021, at approximately 3:40 P.M., SA ███ spoke with PEREZ-RAMIREZ on telephone number 414-517-5178. PEREZ-RAMIREZ stated he would be meet SA ███ at Gamestop, located at 3907 N Richards Street; however this meeting never occurred on October 25, 2021. On October 26, 2021, the following morning, PEREZ-RAMIREZ called SA ███ and explained he was unable to meet SA ███ the previous day due to a "family emergency." During the investigation in this matter, Investigators learned that Alex WEDDLE had been arrested by the Milwaukee County Sheriff's Department on October 25, 2021.

145.    SA ███ and PEREZ-RAMIREZ agreed SA ███ could come back to Milwaukee on a future date to obtain the nine grams of crack cocaine still owed to SA ███

146.    Continuing on October 31, 2021, SA ███ communicated with telephone 414-722-0553 to arrange for SA ███ to receive the nine grams from Alex WEDDLE and his associates on November 1, 2021 at the Gamstop, located at 3907 N Richards Street.

147.    On November 1, 2021, at approximately 1:35 P.M., SA ███ departed the operation's staging location in an undercover vehicle (UCV) and traveled towards Gamestop

located at 3907 N Richards Street. SA ███ was equipped with audio-/video-recording/transmitting devices.

148.     At approximately 1:44 P.M., SA ███ arrived at Gamestop and parked on the west end of the parking lot. At approximately 1:45 P.M., SA ███ called 414-517-5178. PEREZ-RAMIREZ answered the phone. SA ███ identified the individual speaking as PEREZ-RAMIREZ from having previous in-person and telephone contacts with PEREZ-RAMIREZ. SA ███ informed PEREZ-RAMIREZ that SA ███ was waiting for him near Aldi, which is adjacent lot to Gamestop. PEREZ-RAMIREZ then informed SA ███ he would arrive at the location shortly.

149.     At approximately 2:03 P.M., SA ███ received a call from 414-517-5178 by Alex WEDDLE, though Alex WEDDLE was not operating the phone originally. SA ███ identified the individual speaking as WEDDLE from having previous in-person and telephone contacts with Alex WEDDLE. Alex WEDDLE instructed SA ███ to meet him at Popeyes, located at 207 E Capitol Drive, Milwaukee, WI. WEDDLE referred to this location as "The spot I drove to last time." Several moments later, SA ███ departed Gamestop's parking lot and drove the UCV to Popeyes, which was located a short distance northwest of Gamestop.

150.     As SA ███ pulled into the parking lot, SA ███ observed a white Volkswagen Passat with dark tint was backed into a parking stall a short distance to the east of SA ███ As SA ███ parked the UCV, Alex WEDDLE, who was seated in the driver's seat of the Passat, rolled down the window and called for SA ███ to come over to the white Passat.

151.     SA ███ then walked over to Alex WEDDLE's Passat and attempted to open the rear-driver-side door. PEREZ-RAMIREZ, who was seated in the rear driver's-side seat, cracked open the door and instructed SA ███ to get in the rear-passenger seat. SA ███ then walked

around the rear of the vehicle and observed the white Passat had no license plate displayed on the rear-bumper/trunk.

152.     SA ▮▮▮ then entered the rear passenger-seat and observed an unknown black male wearing a yellow hooded sweatshirt seated in the front passenger seat. After SA ▮▮▮ sat down inside the car and shut the door, WEDDLE reached his right hand behind him and provided SA ▮▮▮ with a small, clear plastic baggie containing an amount of purported crack cocaine. Alex WEDDLE then stated, "That's six on what we owe you bro", based on training and experience Investigator understood this to mean six grams.  After asking for clarification on why SA ▮▮▮ was not receiving the nine grams which was owed to SA ▮▮▮ Alex WEDDLE stated, in substance, that providing SA ▮▮▮ with six grams was "fair." SA ▮▮▮ then placed the substance in his pocket and exited the vehicle.

153.     After the operation on November 1, 2021, Investigators weighed and field-tested the suspected crack cocaine. The substance weighed 5.38 grams (with packaging) and field-tested positive for crack cocaine.

### g.  Sixth Undercover Transaction With 414-722-0553 and 414-517-5178–November 17, 2021

154.     On November 17, 2021, beginning at approximately 7:22 A.M., SA ▮▮▮ began communicating via text with telephone numbers 414-722-0553 and 414-517-5178 for the purpose of purchasing an amount of crack cocaine from Alex WEDDLE and members of his ADTO. Over the course of several text messages, SA ▮▮▮ arranged to purchase fourteen grams, approximately 1/2 ounce, of crack cocaine from the ADTO. Please note, SA ▮▮▮ communicated and confirmed with both numbers that SA ▮▮▮ wished to purchase a half ounce of crack cocaine.

155.     At approximately 1:29 P.M., SA ▮▮▮ called 414-517-5178; however, there was no answer. At approximately 1:31 P.M., SA ▮▮▮ called the number again and spoke with

PEREZ-RAMIREZ. SA ▮▮▮ identified the individual speaking as PEREZ-RAMIREZ from having previous in-person and telephone contacts with PEREZ-RAMIREZ. SA ▮▮▮ asked PEREZ-RAMIREZ if PEREZ-RAMIREZ could meet SA ▮▮▮ at a location west of Milwaukee, WI. PEREZ-RAMIREZ stated he would not travel further than "43rd (Brewers Boulevard/Miller Park Way) and National."

156.    PEREZ-RAMIREZ then suggested meeting at "IHOP," which is located at the intersection of Brewers Boulevard and National Avenue in West Milwaukee, WI. SA ▮▮▮ agreed to meet at the IHOP and informed PEREZ-RAMIREZ that SA ▮▮▮ would call PEREZ-RAMIREZ once SA ▮▮▮ was in the area.

157.    At approximately 1:46 P.M., SA ▮▮▮ departed the operation's staging location in an UCV while followed by an ATF cover team. SA ▮▮▮ was equipped with audio-/video-recording/transmitting devices and an amount of pre-recorded ATF buy money. At approximately 1:48 P.M., SA ▮▮▮ initiated the recording equipment.

158.    At approximately 1:58 P.M., SA ▮▮▮ called 414-517-5178 and spoke with PEREZ-RAMIREZ. SA ▮▮▮ informed PEREZ-RAMIREZ that SA ▮▮▮ was waiting for PEREZ-RAMIREZ at Walmart, which was located at 4140 West Greenfield Avenue, West Milwaukee. PEREZ-RAMIREZ then told SA ▮▮▮ he would meet SA ▮▮▮ in "like ten minutes."

159.    At approximately 2:02 P.M., SA ▮▮▮ arrived at Walmart and parked the UCV on the south side of the store in front of the outdoor Lawn & Garden area.  At approximately 2:17 P.M., SA ▮▮▮ texted 414-517-5178 and asked when PEREZ-RAMIREZ would be arriving at Walmart. At approximately 2:22 P.M., SA received a response stating: "Be there in 4mins."  At approximately 2:35 P.M., SA ▮▮▮ called 414-517-5178 and spoke with PEREZ-RAMIREZ.

PEREZ-RAMIREZ stated he was "pulling up."

160. At approximately 2:40 P.M., investigators conducting surveillance at 1437 South 71st Street, West Allis, WI, observed a red Nissan 4 door with Wisconsin plate of AMW9537, OBREGON's registered vehicle, stop in front of 1437 South 71st Street. Investigators then observed a female, fitting the description of OBREGON, exit the automobile and enter the residence at 1437 South 71st Street. A short time later, the female exited the residence, walked up to the driver of the Nissan, and handed him an unknown item. Due to the distance between the Nissan and the surveillance personnel, investigators were only able to determine the driver was a Hispanic male. The Nissan then traveled north on 71st Street and the female re-entered the residence.

161. At approximately 2:45 P.M., SA ▮▮▮ texted 414-517-5178 and again asked when PEREZ-RAMIREZ would be arriving. SA ▮▮▮ received a response at 2:47 P.M., stating, "Pulling up now." At approximately 2:49 P.M., SA ▮▮▮ observed a red Nissan Altima bearing WI license plate "AMW9537", OBREGON's vehicle, pull into the Walmart parking lot from West Greenfield Avenue.

162. Immediately after SA ▮▮▮ observed the Nissan enter Walmart's parking lot, SA ▮▮▮ received a text from 414-517-5178 stating "What car you in." Moments later, SA ▮▮▮ received a call from PEREZ-RAMIREZ, who stated he had arrived at Walmart. The red Nissan then drove towards the UCV and parked approximately two parking rows east of the UCV. SA ▮▮▮ then drove the UCV over to the red Nissan and observed PEREZ-RAMIREZ and a male, who SA ▮▮▮ later identified as Xzayvier WEDDLE, as known as "Zay Bay", through his distinct voice, in the driver and front passenger seats, respectively. SA ▮▮▮ then exited the UCV and approached the red Nissan. As SA ▮▮▮ walked towards the car, PEREZ-RAMIREZ rolled down

the driver's window and instructed SA ▮▮▮ to enter the rear-passenger seat.

163.   SA ▮▮▮ then walked around the back of the Nissan and entered the rear-passenger seat. As SA ▮▮▮ was in the process of entering the vehicle, SA ▮▮▮ observed Xzayvier WEDDLE, a young black male, with short, braided hair, wearing a bright red hooded sweatshirt. Additionally, SA ▮▮▮ observed Xzayvier WEDDLE's had at least three cell phones on his lap (Figure 12 and 13).  I know through training and experience that narcotics traffickers commonly utilize multiple cellular devices to facilitate their drug dealing. Additionally, SA ▮▮▮ observed a fourth cellular phone (iPhone), with the YouTube cellular application open, was mounted on the center of the vehicle's dash-board.



*(Figure 12)*
*Xzayvier WEDDLE with three cellular phones on his lap/in hand.*


*(Figure 13)*
*Screenshot from recordings of Xzayvier WEDDLE's side profile.*

164.    Upon entering the vehicle, PEREZ-RAMIREZ was leaned forward, handling items near his feet. Based on training, experience, and past controlled drug buys, SA ▮▮▮▮ inferred PEREZ-RAMIREZ was weighing the crack cocaine to be purchased on a digital scale.

165.    SA ▮▮▮▮ greeted the vehicle's occupants and PEREZ-RAMIREZ stated it was his birthday. SA ▮▮▮▮ wished PEREZ-RAMIREZ a happy birthday and then asked PEREZ-RAMIREZ how much SA ▮▮▮▮ owed PEREZ-RAMIREZ for the half-ounce of crack cocaine. PEREZ-RAMIREZ responded, "Nine", which based on my training and experience I understood to mean $900.

166.    SA ▮▮▮▮ began counting $900 worth of ATF buy money and then thanked PEREZ-RAMIREZ for meeting SA ▮▮▮▮ at Walmart, due to it being further west than Gamestop, which is the location of previous narcotic transactions. PEREZ-RAMIREZ explained he did not mind, due to the "East Side" being "hot lately." I know from experience working in Milwaukee that the region between Doctor Martin Luther King Drive and Lake Michigan is referred to as the "East Side."

167.     At approximately 1:51 P.M., PEREZ-RAMIREZ sat upright and brought his hands into SA ██████ view. At this time, SA ██████ observed PEREZ-RAMIREZ hold a large plastic bag containing approximately two ounces of suspected crack cocaine (Figure 14).



*(Figure 14)*
*PEREZ-RAMIREZ holding a plastic bag containing approximately two ounces of suspected crack cocaine.*

168.     SA ██████ then asked PEREZ-RAMIREZ, between the two customer phones 414-517-5178 and 414-722-0553, which number SA ██████ should contact to order narcotics. PEREZ-RAMIREZ stated SA ██████ could call/text either number because, "All the phones are ours." In this context, Investigators understood this to mean both telephone numbers belonged to the ADTO.

169.     SA ██████ then asked PEREZ-RAMIREZ if PEREZ-RAMIREZ had obtained any firearms to sell to SA ██████ PEREZ-RAMIREZ explained he was "trying to," but finding firearms was "hard" due to "no one trying to give it up." SA ██████ subsequently asked if PEREZ-RAMIREZ knew individuals selling "switches." PEREZ-RAMIREZ responded, "Not from a motherfucker I can trust." I know from training and experience that "switches" is street vernacular for a device that is installed on Glock pistols that convert the semi-automatic pistol to function as a machine gun.

170.     PEREZ-RAMIREZ then leaned back and handed SA ██████ a white chunky substance suspected to be crack cocaine that had been wrapped inside a knotted, clear plastic bag.

After receiving the suspected crack cocaine from PEREZ-RAMIREZ, SA ▮ handed PEREZ-RAMIREZ $900 in ATF buy money and asked PEREZ-RAMIREZ to count the funds to ensure the amount was correct (Figure 15).



*(Figure 15)*
*PEREZ-RAMIREZ counting ATF buy money.*

171.    SA ▮ then placed the suspected crack cocaine on his undercover digital scale to ensure the amount received from PEREZ-RAMIREZ was correct. SA ▮ scale displayed the substance weighed approximately 12.94 grams with packaging. SA ▮ informed PEREZ-RAMIREZ that the amount provided to SA ▮ was a gram short of the 14 grams SA ▮ had paid for. PEREZ-RAMIREZ initially exclaimed he did not believe SA ▮ was telling the truth; however, after SA ▮ showed the undercover scale to PEREZ-RAMIREZ, PEREZ-RAMIREZ acquiesced and broke off an additional amount of suspected crack cocaine from the approximately two ounces in the large plastic bag previously referenced. PEREZ-RAMIREZ then stated that he did not want to argue with SA ▮ because it was his birthday.

172.    After PEREZ-RAMIREZ had broken the additional amount of suspected crack cocaine off, PEREZ-RAMIREZ handed two small pieces of purported crack cocaine to SA ▮ SA ▮ then placed the two small additional pieces on the undercover scale, which now

registered a net weight of 14.20 grams (net weight = original 12.94 grams with packaging + additional two small pieces). SA ███ then stated they were "straight."

173.    PEREZ-RAMIREZ then informed SA ███ that PEREZ-RAMIREZ still intended to provide SA ███ with an additional "gram" of crack cocaine that was owed to SA ███ from a previous transaction. When SA ███ asked PEREZ-RAMIREZ to provide SA ███ with the additional gram at the present time, PEREZ-RAMIREZ stated, in substance, that PEREZ-RAMIREZ did not want to provide SA ███ with any additional crack cocaine without payment at that time. PEREZ-RAMIREZ explained he only wanted to sell the crack cocaine PEREZ-RAMIREZ currently possessed as opposed to settling a debt because it was PEREZ-RAMIREZ's birthday, and PEREZ-RAMIREZ wanted to earn as much money as PEREZ-RAMIREZ possibly could. SA ███ ultimately stated SA ███ would be fine receiving the crack cocaine still owed to him during a future transaction.

174.    At approximately 2:53 P.M., the cell phone mounted to the Nissan's dash began to ring and Xzayvier WEDDLE then answered the phone and stated, "Come down I'll be there in three minutes." SA ███ believed this phrase to be important due to the fact that during previous interactions SA ███ has had with Alex WEDDLE and PEREZ-RAMIREZ, both individuals had instructed SA ███ to "come down" to purchase suspected crack cocaine from them. When Xzayvier WEDDLE answered the incoming call at 2:53 P.M., SA ███ immediately recognized Xzayvier WEDDLE's distinct voice to be the same voice as an individual Alex WEDDLE and MACK-HOWARD referred to as "Zay Bay" in recorded jail calls discussed later in this affidavit.

175.    At approximately 2:54 P.M., the cell phone mounted to the dash began to ring again. Xzayvier WEDDLE again answered the phone and informed the caller that Xzayvier WEDDLE would "be there in three minutes" (Figure 16). At approximately 2:55 P.M., the iPhone

mounted on the dash received another call. Xzayvier WEDDLE again answered the phone and informed the caller, "I'm getting off the highway right now I'll be there in three minutes."



*(Figure 16)*
*Xzayvier WEDDLE picking up the mounted iPhone (which displays an incoming call).*

176.     At approximately 2:55 P.M., after SA ████ informed PEREZ-RAMIREZ that SA ████ was satisfied with the amount of purported crack cocaine provided to him by PEREZ-RAMIREZ, PEREZ-RAMIREZ placed the approximately two ounces of suspected crack cocaine in the center console of the vehicle.  At approximately 2:56 P.M., SA ████ exited PEREZ-RAMIREZ's vehicle and thanked him for the transaction. SA ████ then walked back and re-entered the UCV as PEREZ-RAMIREZ drove out of Walmart's parking lot.

177.     At approximately 2:59 P.M., SA ████ exited Walmart's parking lot and traveled towards a pre-determined location as he was followed by a designated cover team. At approximately 3:06 P.M., SA ████ terminated the recording equipment.  At approximately 3:20 P.M., SA ████ arrived at the post-operation location and the operation was concluded.

178.     After the operation, SA ████ and I weighed and field-tested the suspected crack cocaine. The substance weighed approximately 14.18 grams with packaging and field-tested positive for crack cocaine.

179.     On the same date, at approximately 9:00 P.M., Investigators drove past 1437 South

71st Street and observed OBREGON's Nissan parked in front of the residence. Investigators observed the Nissan was running due to the headlights and taillights of the vehicle being illuminated. Investigators then drove around the block to establish a position of fixed surveillance; however, when Investigators were able to observe the residence again, the Nissan had departed.

### h. **Seventh Undercover Transaction With 414-722-0553 and 414-517-5178– November 17, 2021**

180. On December 7, 2021, at approximately 7:51 P.M., SA ███ called 414-722-0553. Xzayvier WEDDLE answered the phone and greeted SA ███ SA ███ Xzayvier WEDDLE, "Zay"/"Nephew", based on SA ███ in-person and recorded telephone conversations with Xzayvier WEDDLE during undercover controlled buys (referenced in subsection g). SA ███ asked Xzayvier WEDDLE to speak to "Lil Bro." SA ███ knows through information learned over the course of this investigation that "PEREZ-RAMIREZ" is referred to as "Lil Bro" by members of the ADTO.

181. "Xzayvier WEDDLE informed SA ███ that "Lil Bro" was not around at that time. Xzayvier WEDDLE then asked, "You need me?" In this context, SA ███ understood this question to mean Xzayvier WEDDLE was asking SA ███ if SA ███ wished to purchase narcotics.

182. SA ███ then explained that ███ would rather have "Lil Bro" call him back, and Xzayvier WEDDLE explained, "I work during the day until late at night. He (PEREZ-RAMIREZ) come out at nighttime. He (PEREZ-RAMIREZ) come out around midnight. We got shifts yup." Based on the investigation into the ADTO, this trading of drug customer phones was consistent with the operations of the organization.

183. After receiving this information from Xzayvier WEDDLE," SA ███ informed

Xzayvier WEDDLE that SA ███ wanted to purchase two ounces of crack cocaine the following day. SA ███ followed up this request by asking how much two ounces of the substance would cost. Alex WEDDLE then spoke on the phone to SA ███ and stated, "I aint even gonna lie, Dwayne, I can only do one of them (ounces) bro, I cant do no two right now." SA ███ undercover name is Dwayne. SA ███ identified Alex WEDDLE through SA ███ numerous in-person and telephone contacts during undercover controlled buys with Alex WEDDLE. Additionally, based on training and experience, SA ███ understood this to mean Alex WEDDLE did not want to sell SA ███ two ounces of crack cocaine due to his limited supply; however, Alex WEDDLE could still sell one ounce of crack cocaine to SA ███ SA ███ then asked Alex WEDDLE if Alex WEDDLE could reduce the price of one ounce of crack cocaine to $1,700, which is $100 less than what Alex WEDDLE had previously charged SA ███ for the same amount. Alex WEDDLE begrudgingly replied, "Yeah bro I could do it for ya." SA ███ then explained he would call Alex WEDDLE tomorrow to coordinate the purchase. Alex WEDDLE replied, "Alright bet bro call me."

184. On December 8, 2021, at approximately 10:32 A.M., SA ███ texted 414-722-0553 "Imma come grab that this afternoon prolly like 2ish." 414-722-0553 replied approximately one minute later, "Bet" and "I'm ready when u ready my baby."

185. On December 8, 2021, at approximately 10:41 A.M., SA ███ received a call from 414-722-0553; however, the call could not be connected. SA ███ then received the following text messages, "This Rico," "So u know." Immediately after receiving these messages, SA ███ called 414-722-0553 and was greeted by a male's voice that SA ███ recognized to be that of PEREZ-RAMIREZ, based on prior undercover controlled buys. PEREZ-RAMIREZ asked, "What you want me to have ready for you, bro?" SA ███ then explained SA ███ had

wanted to purchase two ounces of crack cocaine; however, Alex WEDDLE had told SA ███

that Alex WEDDLE could only afford to sell SA ███ one ounce. SA ███ and PEREZ-

RAMIREZ then agreed to meet at the "same spot" that PEREZ-RAMIREZ had met SA ███ at

previously. Based on the previously undercover controlled buy with PEREZ-RAMIREZ, SA

███ understood this to mean they would meet at the Walmart parking lot located at 4140 West

Greenfield Ave.

186.    At approximately 1:33 P.M., SA ███ texted 414-722-0553, "Be about 20 mins."

414-722-0553 responded, "Bet I'll be there in 10."

187.    At approximately 1:45 P.M., SAs ███ and ███ departed the ATF

Milwaukee Field Office in a UCV. Both SAs were equipped with audio-/video-

recording/transmitting devices and an amount of pre-recorded ATF buy money.

188.    At approximately 1:56 P.M., SA ███ called 414-722-0553 and spoke with

PEREZ-RAMIREZ. SA ███ informed PEREZ-RAMIREZ SA ███ was about to arrive at

Walmart. PEREZ-RAMIREZ then stated PEREZ-RAMIREZ would also soon be arriving at

Walmart.

189.    At approximately 1:58 P.M., SAs ███ and ███ arrived at Walmart and parked

on the south end of the store adjacent to the Lawn & Garden center.

190.    At approximately 2:00 P.M., SA ███ observed a red Nissan Altima bearing WI

registration "AMW9537" pull into the Walmart parking lot from Greenfield Avenue. The Nissan

then drove towards the UCV and parked in the adjacent parking space. As the Nissan parked, SA

███ observed the vehicle was being driven by PEREZ-RAMIREZ with an unknown Hispanic

male laid back in the front passenger seat. SA ███ then exited the UCV and entered the rear

passenger seat of the Nissan.

191.    Upon entering the Nissan, SA ▮▮▮ observed the rear-driver seat was occupied by Xzayvier WEDDLE (Figure 17), who was wearing a red hooded sweatshirt and red pants. SA ▮▮▮ recognized Xzayvier WEDDLE as the same person who had accompanied PEREZ-RAMIREZ during the undercover controlled buy on November 17, 2021 (as described in subsection g).



*(Figure 17)*
*Xzayvier WEDDLE seated in the rear-driver seat, (wrist tattoo circled in red).*

192.    After SA ▮▮▮ closed the rear-passenger door, SA ▮▮▮ asked if the front passenger was okay due to the unknown Hispanic male being unconscious (Figure 18). PEREZ-RAMIREZ stated the unknown Hispanic male was okay as PEREZ-RAMIREZ reached over and sat the front-passenger seat upright, so that SA ▮▮▮ would have more room in the back seat.


*(Figure 18)*
*UM3 in front-passenger seat.*

193.    After engaging in general conversation with SA ███ PEREZ-RAMIREZ reached inside his right coat pocket and removed a small, white chunky substance, which based on my training and experience was suspected crack cocaine, that was wrapped in a clear plastic bag. PEREZ-RAMIREZ then reached back and handed the suspected crack cocaine to SA ███ (Figure 19 and Figure 20).


*(Figure 19)*
*PEREZ-RAMIREZ retrieving the pre-packaged suspected crack cocaine from his coat pocket.*



*(Figure 20)*
*PEREZ-RAMIREZ as he hands the pre-packaged suspected crack cocaine to SA* ███

194.     SA ███ then asked PEREZ-RAMIREZ if he had a scale in the vehicle, so that SA ███ could weigh the substance. PEREZ-RAMIREZ gesticulated with his head that the scale was in the back seat as he said "Zay", referring to Xzayvier WEDDLE.  Xzayvier WEDDLE then placed a small, black digital scale on the rear-center console. Xzayvier WEDDLE then powered the scale on and clicked the zero-out function. SA ███ then placed the purported crack cocaine on the scale, which displayed a net weight of approximately 24 grams. SA ███ informed PEREZ-RAMIREZ that the substance was several grams short of an ounce, 28 grams, and invited PEREZ-RAMIREZ to weigh the substance on the front-center console, due to the front-center console offering a sturdier platform.

195.     After looking back to observe the weight of the substance, PEREZ-RAMIREZ grabbed the purported crack cocaine and the black digital scale and placed it on the front-center console. After PEREZ-RAMIREZ placed the scale beside him, he zeroed-out the scale and placed the purported crack cocaine back on the scale, which now displayed a net weight of approximately 25 grams. After SA ███ informed PEREZ-RAMIREZ that the substance was still "light," PEREZ-RAMIREZ explained, "When bro cook it, you know when you cook it like that, we don't,

we barely put any baking soda, we try to keep it as pure as possible. It's still a whole zip, you're still gonna get your money's worth." Based on the investigation and prior undercover buys with the ADTO, SA ▓ understood "bro" to be a reference to Alex WEDDLE. Also based on training and experience, SA ▓ understood PEREZ-Ramirez's comments as to the cooking and weight of the controlled substance to mean that although the substance weighed less than one ounce, SA ▓ was still receiving an ounce worth of crack cocaine due to the substance being more pure than other crack cocaine due to the low amount of baking soda used to manufacture the substance.

196.     PEREZ-RAMIREZ handed the suspected crack cocaine back to SA ▓ and then retrieved an additional knotted, clear plastic bag containing approximately one ounce of suspected crack cocaine from somewhere on his person and stated, "I got you my baby" (Figure 21). PEREZ-RAMIREZ proceeded to untie the knot and broke off two additional small pieces of unpackaged suspected crack cocaine. After breaking these pieces off, PEREZ-RAMIREZ placed them on the digital scale before he provided them, without packaging, to SA ▓



*(Figure 21)*

*PEREZ-RAMIREZ in the process of untying an additional plastic bag containing suspected crack cocaine.*

197.    At this time, SA ▮▮▮ began counting the ATF buy money, so he could pay for the narcotics. As SA ▮▮▮ counted the funds, SA ▮▮▮ informed PEREZ-RAMIREZ that SA ▮▮▮ spoke with "Bro", Alex WEDDLE, the previous evening, and "Bro" had agreed to sell the ounce to SA ▮▮▮ for $1,700. After SA ▮▮▮ finished counting the funds, PEREZ-RAMIREZ instructed SA ▮▮▮ to hand the funds to "Nephew." Xzayvier WEDDLE extended his hand towards SA ▮▮▮ and at that time SA ▮▮▮ provided $1,700 in ATF buy money to Xzayvier WEDDLE.

198.    At approximately 2:04 P.M., SA ▮▮▮ exited the rear-passenger seat and asked PEREZ-RAMIREZ how much SA ▮▮▮ partner, SA ▮▮▮ would need to purchase a "ball." PEREZ-RAMIREZ replied, "Bro wants two-fifty ($250)." Based on the investigation into the ADTO, SA ▮▮▮ understood "bro" to be a reference to Alex WEDDLE. SA ▮▮▮ then went back into the UCV and informed SA ▮▮▮ that PEREZ-RAMIREZ would charge $250 for the "ball." SA ▮▮▮ proceeded to exit the UCV and enter the rear passenger door of PEREZ-RAMIREZ's vehicle.

199.    Upon entering the vehicle, SA ▮▮▮ observed PEREZ-RAMIREZ seated in the driver's seat with his right hand inside a plastic baggie in his lap. SA ▮▮▮ then confirmed with PEREZ-RAMIREZ if the price for 3.5 grams of crack cocaine was $250. PEREZ-RAMIREZ stated "Yeah" and then proceeded to ask SA ▮▮▮ "That's cool wit you?"; to which, SA ▮▮▮ affirmed that the price was good. SA ▮▮▮ then observed PEREZ-RAMIREZ transfer an item from the center console area of the vehicle to a plastic baggie in his lap, tying the baggie off and then handing the baggie, containing suspected crack cocaine, back to SA ▮▮▮

200.    SA ▮▮▮ also observed another plastic baggie in PEREZ-RAMIREZ's left hand

which appeared to contain a white substance, when RAMIREZ was handing the 3.5 grams of crack cocaine back to SA ███ SA ███ then proceeded to hand RAMIREZ $250 of ATF buy money for the crack cocaine, exited RAMIREZ'S vehicle, and reentered the UCV. It is important to note during the duration of the UC purchase SA ███ observed Xzayvier WEDDLE in the back seat holding a large sum of United States Currency in his lap, which was previously provided to him by SA ███

201.     After SA ███ rejoined SA ███ in the UCV, SA ███ exited the UCV and opened the rear-passenger door of the Nissan. SA ███ then thanked PEREZ-RAMIREZ and stated SA ███ would call PEREZ-RAMIREZ in the near future to conduct additional transactions. SA ███ then closed the Nissan's door and reentered the UCV. At approximately 2:06 P.M., the Nissan exited Walmart's parking lot and turned onto Greenfield Avenue.

202.     After the operation was concluded, SAs ███ and ███ weighed and field-tested the suspected crack cocaine. The suspected crack cocaine purchased by SA ███ weighed 26.58 grams and the suspected crack cocaine purchased by SA ███ weighed 4.13 grams, both weights include packaging. Additionally, the substance field-tested positive for crack cocaine.

i.    **EIGHTH UNDERCOVER PURCHASE – JANUARY 5, 2022**

203.     On January 4, 2022, at approximately 7:42 P.M., SA ███ called telephone No. 414-517-517. Upon the call being connected, Alex WEDDLE greeted SA ███

204.     SA ███ explained he (███ wanted to purchase narcotics the following day. Alex WEDDLE then asked SA ███ what SA ███ was seeking to purchase when he (WEDDLE) asked, "What are we doing?" SA ███ informed Alex WEDDLE that SA ███ was seeking to purchase one ounce of crack cocaine and a "tester" of powder cocaine (cocaine hydrochloride (HCL), or simply, "cocaine"). Please Note, SA ███ knows through training and

experience that a "tester" is common street vernacular used to reference a small amount of narcotics.

205.     After SA ███ finished telling Alex WEDDLE what he (███ wanted to buy, a different, higher-pitched voice stated, "I got you." SA ███ identified this higher-pitched voice to be that of Xzayvier WEDDLE.  SA ███ knows from previous undercover telephone calls made to and from the ADTO that it is common for several members of the ADTO to participate in a telephone call with SA ███ SA ███ then stated he (███ would call back the following day to coordinate and arrange the transaction.

206.     On January 5, 2022, at approximately 12:10 P.M., SA ███ texted telephone No. 414-517-5178, "U still gon be around later?" Because SA ███ knows from information gleaned over the course of this investigation that the ADTO utilizes several telephone numbers, SA ███ also texted telephone No. 414-722-0553, asking, "U still gon be around this afternoon." At approximately 12:15 P.M., telephone No. 414-722-0553 responded, "Yeah what we doing?"

207.     At approximately 12:19 P.M., SA ███ texted 414-722-0553, "Need to grab an onion (*one ounce of crack cocaine*) n a little sum sum of the soft (*cocaine*)." 414-722-0553 then texted back, "How much soft."

208.     At approximately 12:20 P.M., SA ███ texted 414-722-0553, asking what the ADTO would charge SA ███ for 3.5 grams of cocaine. After SA ███ did not receive a text reply, at approximately 1:42 P.M., SA ███ texted 414-722-0553, "Wtw (*what's the word*)."

209.     At approximately 1:46 P.M., SA ███ received a call from 414-722-0553. Upon the call being connected, SA ███ was greeted by PEREZ-RAMIREZ. PEREZ-RAMIREZ then asked, "Where you (███ at, I thought you was coming down." SA ███ explained he (███ was still planning to meet PEREZ-RAMIREZ that day; however, SA ███ would not be in

Milwaukee until later that afternoon.

210.    PEREZ-RAMIREZ then stated, "Nephew (Xzayvier WEDDLE) said you was coming down, that's why I was asking." PEREZ-RAMIREZ then added that he wanted to know when SA ███ was planning to meet with him (PEREZ-RAMIREZ) so that PEREZ-RAMIREZ could have the narcotics "ready" for SA ███

211.    SA ███ then overheard PEREZ-RAMIREZ speaking to an unknown female. PEREZ-RAMIREZ, acknowledging that SA ███ could hear the female, stated, "I'm working, I just walked out the house, I'm working so everybody taken care of, I'm just out here, I'm working."

212.    SA ███ then asked PEREZ-RAMIREZ what the cost would be for 3.5 grams of cocaine. PEREZ-RAMIREZ responded, "To be honest with you.. right now.. I already got it whipped up, right now all I got is the hard on me." In this context, SA ███ understood this to mean at that time, PEREZ-RAMIREZ only had crack cocaine with him because the cocaine had already been converted into crack cocaine.

213.    SA ███ then asked when PEREZ-RAMIREZ would have additional cocaine available to be purchased. PEREZ-RAMIREZ replied, "Uhhh I can get it before you get here. That's for sure." PEREZ-RAMIREZ continued, "The ticket (price of the narcotics) will probably… You know the ball they want 250… A ball… But umm.. yeah.. Bring me like 240 I can do it for like 240 or something like that, 230." In this context, SA ███ understood this to mean PEREZ-RAMIREZ's source for cocaine would charge $250 for 3.5 grams (commonly referred to as an "eight ball," or simply, a "ball"); however, PEREZ-RAMIREZ would sell 3.5 grams of cocaine to SA ███ for as little as $230.

214.    SA ███ explained he (███ believed that was a fair price and then asked if the

price for one ounce of crack cocaine would be $1700, which is what SA ███ had paid for that amount during the previous transaction. PEREZ-RAMIREZ then stated, "For you, yeah."

215.    At approximately 3:51 P.M., SA ███ texted 414-722-0553, stating that SA ███ would be arriving in the area in approximately 30 minutes. SA ███ also asked if PEREZ-RAMIREZ would meet SA ███ at Walmart, located at 4140 West Greenfield Ave, West Milwaukee, WI. SA ███ immediately received a text response from 414-722-0553 confirming this Walmart location was okay with PEREZ-RAMIREZ.

216.    At approximately 4:10 P.M., SA ███ departed a pre-determined operational staging area in a UCV as he was followed by a designated cover team. Please note, SA ███ was also equipped with an amount of ATF buy money and electronic surveillance (ES) devices that were activated prior to the transaction.

217.    At approximately 4:27 P.M., SA ███ arrived at Walmart and parked his UCV on the south end of Walmart's parking lot, which is near the Lawn and Garden section of the store. At approximately 4:29 P.M., SA ███ texted 414-722-0553 and stated he (███ was near the Lawn and Garden area of the store. SA ███ immediately received a text reply from 414-722-0553, stating, "Ok" and "I'll be there in less than 3-4 mins."

218.    At approximately 4:36 P.M., SA ███ observed a red Nissan Altima bearing WI registration "AMW9537" (registered OBREGON) turn into Walmart's parking lot from West Greenfield Avenue. SA ███ observed the Nissan travel towards SA ███ UCV before it ultimately parked directly next to the UCV's passenger side. As the Nissan passed SA ███ he observed the Nissan was being driven by PEREZ-RAMIREZ.

219.    At approximately 4:37 P.M., SA ███ exited the UCV, walked over to the passenger side of the Nissan, and entered the rear-passenger seat. Once SA ███ entered the

Nissan, SA ▮▮▮ observed PEREZ-RAMIREZ in the driver's seat, Xzayvier WEDDLE in the front passenger seat, and an individual, later identified as Gerald JONES in the rear driver's-side seat.

220.    SA ▮▮▮ then engaged in general conversation with PEREZ-RAMIREZ, Xzayvier WEDDLE, and JONES for a short period of time before PEREZ-RAMIREZ produced a clear plastic bag containing a large amount of suspected crack cocaine (Figure 22). PEREZ-RAMIREZ then leaned forward, placed a small black digital scale at his feet, and began placing pieces of the suspected crack cocaine on the digital scale. PEREZ-RAMIREZ then asked, "You want the same that you always get, and a ball, right?" In this context, SA ▮▮▮ understood this to mean PEREZ-RAMIREZ was clarifying SA ▮▮▮ wanted to purchase one ounce of crack cocaine and 3.5 grams of cocaine.



*(Figure 22)*
*PEREZ-RAMIREZ holding plastic bag containing suspected crack cocaine*

221.    PEREZ-RAMIREZ then stated, "I just picked up the soft too. I just bought it off my guy."

222.    After PEREZ-RAMIREZ completed weighing the purported crack cocaine, he

placed the suspected crack cocaine he had just weighed on PEREZ-RAMIREZ's scale into a separate clear plastic bag, which he subsequently handed to SA ███

223.    PEREZ-RAMIREZ then handed SA ███ a small, knotted-off, corner-cut plastic bag with a white powdery substance to SA ███

224.    After PEREZ-RAMIREZ handed the purported crack cocaine to SA ███ PEREZ-RAMIREZ stated the purported crack cocaine had just been "whipped up," which SA ███ understood to mean the crack cocaine had recently been manufactured.

225.    PEREZ-RAMIREZ then placed the first-referenced bag containing the large amount of suspected crack cocaine inside the Nissan's center console.

226.    After receiving the purported narcotics, SA ███ retrieved his undercover digital scale from his coat pocket and placed it on the middle seat between SA ███ and JONES. SA ███ attempted to zero-out the scale; however, the surface of the middle seat was soft and uneven, which caused SA ███ to have difficulty zeroing-out his undercover scale. JONES, who was watching SA ███ struggle to zero-out the scale, lowered the middle seat's cup holder, which offered SA ███ a solid, even surface.

227.    After receiving assistance from JONES, SA ███ placed the purported narcotics on the undercover scale; however, because of the cold weather, the undercover scale was malfunctioning, so SA ███ asked to use PEREZ-RAMIREZ's digital scale. PEREZ-RAMIREZ then retrieved his digital scale and handed it to SA ███ SA ███ then placed the purported narcotics on PEREZ-RAMIREZ's scale and observed the weight of the purported crack cocaine was approximately 27.5 grams while the purported cocaine weighed approximately 2.1 grams. SA ███ then stated that the amounts were "close" to what SA ███ had ordered and stated he would pay $1,950 for the narcotics. SA ███ then removed an amount of ATF buy money from

his coat pocket, counted $1,950 worth of funds, and then provided the money to PEREZ-RAMIREZ, who subsequently confirmed the amount provided was $1,950.

228.     PEREZ-RAMIREZ then stated he had spoken to his "guy," who had told PEREZ-RAMIREZ the "border" was "about to close." PEREZ-RAMIREZ stated because of the potential border closing, the price of narcotics would most-likely be raised from their current rate.

229.     SA ▇▇▇ then informed PEREZ-RAMIREZ that SA ▇▇▇ had a video that he (▇▇▇ wanted to show PEREZ-RAMIREZ. SA ▇▇▇ then held his cell phone, which contained a four-second video of SA ▇▇▇ shooting a fully-automatic Glock pistol, towards PEREZ-RAMIREZ. Please note, both Xzayvier WEDDLE and JONES moved to a position to where they could also observe the video.

230.     SA ▇▇▇ then played the short video; however, the audio was not activated. After Xzayvier WEDDLE watched the muted version of the video, he stated, "That make me wanna show you a video of a switch." SA ▇▇▇ knows through training and experience that the auto-sear allowing a Glock pistol to function as a machine gun is commonly referred to as a "switch."

231.     SA ▇▇▇ then activated the audio on the video and played it a second time. PEREZ-RAMIREZ joyfully exclaimed the video was "awesome" and Xzayvier WEDDLE asked, as he produced a cell phone, "Wanna see my shit? My shit jam."

232.     PEREZ-RAMIREZ, without prompting from SA ▇▇▇ then asked, "What you want for one?" SA ▇▇▇ then asked PEREZ-RAMIREZ for clarification, inquiring as to whether PEREZ-RAMIREZ wanted to purchase a stand-alone "switch" or if PEREZ-RAMIREZ wanted a Glock pistol already installed with the auto-sear. PEREZ-RAMIREZ stated, in substance, that he only wanted to buy the "switch" because he already knew how to install the "switch" onto a Glock pistol.

233.    PEREZ-RAMIREZ then went on to explain that he possesses a wealth of knowledge and experience regarding firearms.  PEREZ-RAMIREZ further explained he takes pride in knowing the nomenclature of his firearms, stating, "I like to know my guns inside and out. I will sit down with my gun for two or three hours and just play with it."

234.    SA ███ then stated he appreciated the fact that PEREZ-RAMIREZ takes the time to familiarize himself with his guns, because many individuals do not know how to safely operate their firearms. Xzayvier WEDDLE then stated, "That's why they in jail and we free."

235.    PEREZ-RAMIREZ then began to explain the process of taking firearms apart to clean them when Xzayvier WEDDLE interjected, "I was just finna (*going to*) do it (clean his firearm) before we left the house. But we was in a rush."

236.    SA ███ then asked PEREZ-RAMIREZ, "You got a Glock already, don't you?" PEREZ-RAMIREZ replied, "I got like three Glocks." SA ███ then acknowledged that he knew PEREZ-RAMIREZ's girlfriend (OBREGON) possessed at least one Glock pistol, but SA ███ did not know PEREZ-RAMIREZ possessed additional Glock pistols. PEREZ-RAMIREZ then reiterated, "I got a couple of them bitches (Glock pistols)."

237.    PEREZ-RAMIREZ then reached under his lap and stated, "I got this right here. 1911," as he produced a firearm with a silver slide, black hammer, and rosewood grip. SA ███ identified this was the same firearm PEREZ-RAMIREZ brandished on September 17, 2021 (reference in subsection c), when SA ███ purchased crack cocaine from PEREZ-RAMIREZ, HOWZE, and WEDDLE.

238.    PEREZ-RAMIREZ then handed the Kimber pistol to SA ███ PEREZ-RAMIREZ then stated, "You know that's like a twelve-hundred dollar gun." SA ███ examined the firearm and identified the firearm possessed markings consistent with a Kimber pistol.

239.     SA ███ then asked PEREZ-RAMIREZ if he would consider selling the firearm to SA ███ PEREZ-RAMIREZ declined SA ███ offer to purchase the firearm, as he explained that the Kimber pistol was PEREZ-RAMIREZ's "baby." PEREZ-RAMIREZ explained that he purchased the Kimber pistol from his "guy." PEREZ-RAMIREZ also stated, "That's an original Kimber. You can't find those anywhere."

240.     SA ███ then removed the magazine of the firearm and observed the firearm was loaded with 9mm (caliber) ammunition. SA ███ asked how many rounds of ammunition the magazine could hold, to which PEREZ-RAMIREZ replied, "Seven. One up is eight." SA ███ knows through training and experience that "one up" is common street vernacular for a bullet being seated in the chamber of a firearm.

241.     Before SA ███ handed the pistol back to PEREZ-RAMIREZ, PEREZ-RAMIREZ reiterated he would not sell the firearm because the Kimber pistol is his "baby." PEREZ-RAMIREZ then further explained he can carry the gun "anywhere" due to the firearm being small and compact. PEREZ-RAMIREZ stated he could carry the firearm, "and wouldn't nobody know. That's why I don't' wanna get rid of it. That's the only one I got like that. The other one is too chunky."

242.     After Xzayvier WEDDLE heard PEREZ-RAMIREZ say PEREZ-RAMIREZ didn't have any other guns that were as small as the Kimber pistol, Xzayvier WEDDLE stated, "We got the .380." SA ███ knows through training and experience that "380" is common vernacular for a firearm that utilizes .380 caliber ammunition. Typically, these .380 caliber firearms are small and compact, especially compared to larger caliber firearms such as 9mm or .40.

243.     PEREZ-RAMIREZ then addressed Xzayvier WEDDLE, stating, "The 380 – I gave

that one to sis… When she lost her gun. When they took her gun from her." SA ███ knows from information gleaned over the course of this investigation that MACK-HOWARD is commonly referred to by members of the ADTO as "Sis."

244.    Xzayvier WEDDLE, addressing PEREZ-RAMIREZ, replied, "Remember… we still got it though." PEREZ-RAMIREZ, responding to Xzayvier WEDDLE, explained, "That's his gun. I just told you I gave it to him when they took hers."

245.    For context, Alex WEDDLE's was arrest on October 25, 2021 by the MCSO after Alex WEDDLE, who was the passenger in MACK-HOWARD's Audi Q7, driven by MACK-HOWARD, allegedly pointed a firearm at another driver on Interstate-43 near Milwaukee, WI. After MCSO Deputies located MACK-HOWARD's Audi Q7 in Milwaukee on Capitol Drive, they located a Smith & Wesson 9mm pistol between the passenger seat and the center console of the Audi. Referencing the statements made by PEREZ-RAMIREZ, in this context, SA ███ understood this to mean MACK-HOWARD, "Sis", purchased the firearm that was recovered by MCSO for Alex WEDDLE. After MCSO Deputies seized Alex WEDDLE's pistol on October 25, 2021, PEREZ-RAMIREZ provided Alex WEDDLE with one of PEREZ-RAMIREZ's own .380 caliber pistols.

246.    Returning to the undercover transaction taking place, PEREZ-RAMIREZ, turning his attention back to SA ███ explained PEREZ-RAMIREZ did not like .380 caliber firearms because of their tendency to "jam." SA ███ then stated ███ agreed and did not like .380 caliber firearms because the bullet size is small compared to other calibers. SA ███ stated he preferred firearms that were 9mm caliber and larger. PEREZ-RAMIREZ then agreed with SA ███ stance on using larger caliber firearms when he stated, "You… you can hurt a motherfucker but it's not gonna take a motherfucker.. like.. down.. unless you shoot them in the

face or something."

247. Bringing the conversation back to auto-sears (which would convert the firearm to a machine gun), SA ███ stated ███ would be open to the possibility of trading a "switch" for narcotics or simply having PEREZ-RAMIREZ pay for the "switch" with cash. PEREZ-RAMIREZ agreed to consider both options and stated, "Tell me how you wanna do it and I'll make it work." PEREZ-RAMIREZ then instructed SA ███ "Grab me one. And then when you come down bring it with you and let me know what you want, and I'll make it work right then and there."

248. SA ███ then informed PEREZ-RAMIREZ that SA ███ could obtain several switches, but SA ███ would need PEREZ-RAMIREZ to vouch for the legitimacy of the other purchasers. PEREZ-RAMIREZ then stated, "Every time you come down you gonna deal with me or "Bro" (Alex WEDDLE)." Xzayvier WEDDLE then interjected, "And 'Nephew'!" Xzayvier WEDDLE then added, "I like guns too, so if I text, don't tell them (PEREZ-RAMIREZ and Alex WEDDLE)."

249. PEREZ-RAMIREZ waited for Xzayvier WEDDLE to finish speaking and then stated, "When you come down, most of the time I'm gonna be in the car. You know what I'm saying, I make sure everything go right. Imma deal with you. You know what I'm saying. Sometimes I might have "Nephew," but Imma be in the car. So you know everything gonna be smooth. No bullshit." PEREZ-RAMIREZ then explained that SA ███ was one of PEREZ-RAMIREZ's favorite narcotics customers, stating, "Even if I'm off, I come in. I come in on my day off just to make sure you are taken care of, and I go right back home."

250. PEREZ-RAMIREZ then asked SA ███ "What you charging for like an AR (*style of firearm*) or something?" SA ███ then asked PEREZ-RAMIREZ for specifics on the type of AR firearm PEREZ-RAMIREZ was looking to purchase. Xzayvier WEDDLE then

interjected and stated, "Something like this." Xzayvier WEDDLE then unlocked his Apple iPhone and went into his photo/video gallery. Xzayvier WEDDLE then briefly scrolled through his photo/video library before he opened a short video of a black individual's arm holding an AR-style pistol as they rotated the firearm back and forth.

251. SA ▮▮▮ then asked PEREZ-RAMIREZ for clarification, "Okay so you want a pistol like that (AR-pistol in Xzayvier WEDDLE's video)?" PEREZ-RAMIREZ replied, "I'll take one like that… with the "switch" on it though."

252. SA ▮▮▮ wanting absolute clarification, asked PEREZ-RAMIREZ if he wanted SA ▮▮▮ to obtain a fully-automatic AR-style pistol for PEREZ-RAMIREZ, to which PEREZ-RAMIREZ responded, "Yeah." SA ▮▮▮ then stated that he would speak with ▮▮▮ cousin about pricing and then let PEREZ-RAMIREZ know how much an AR-style pistol with the auto-sear installed would cost.

253. SA ▮▮▮ then asked PEREZ-RAMIREZ if PEREZ-RAMIREZ wanted to purchase PEREZ-RAMIREZ's own AR pistol and have SA ▮▮▮ cousin install the auto-sear or if PEREZ-RAMIREZ wanted an AR pistol already equipped with an auto-sear. PEREZ-RAMIREZ explained he did not want to purchase an AR-style firearm legitimately through a gun store and stated, "I don't wanna buy an AR out the store. I would rather buy it from you." PEREZ-RAMIREZ then added, "Find out and get me a price and we'll go from there."

254. At approximately 4:57 P.M., as the conversation was about to conclude, Xzayvier WEDDLE instructed SA ▮▮▮ "Find me a Taurus (firearm)." PEREZ-RAMIREZ laughed and instructed SA ▮▮▮ "Don't listen to him (Xzayvier WEDDLE)." Xzayvier WEDDLE then became upset with PEREZ-RAMIREZ and informed SA ▮▮▮ "I'm dead-ass (serious). On my momma grave I'm for real." SA ▮▮▮ then thanked PEREZ-RAMIREZ and exited the Nissan.

SA ████ then walked back to the UCV and waited for the Nissan to exit Walmart's lot prior to SA ████ departing.

255. At approximately 4: 59 P.M., SA ████ departed Walmart and traveled towards a pre-determined location as he was followed by a designated cover team. At approximately 5:05 P.M., SA ████ terminated the electronic surveillance equipment.

256. After the operation on January 5, 2022, SA ████ and I weighed and field-tested the purported narcotics. The purported crack cocaine weighed 27.56 grams (with packaging) and field-tested positive for crack cocaine. The purported cocaine weighed 2.09 grams (with packaging) and field-tested positive for cocaine.

### j. Ninth Undercover Purchase With 414-722-0553 and 414-517-5178 – January 21, 2022 - <u>TARGET LOCATION B</u>

257. On January 20, 2022, at approximately 8:22 P.M., SA ████ acting in an undercover capacity, called 414-722-0553, Upon the call being connected, SA ████ spoke with Xzayvier WEDDLE. SA ████ asked Xzayvier WEDDLE to obtain the price for one ounce of crack cocaine and two ounces of powder cocaine. Xzayvier WEDDLE stated he would speak to "Unc" and then contact SA ████ once Xzayvier WEDDLE had obtained the price for the narcotics. I know based on the investigation of the ADTO Xzayvier WEDDLE called Alex WEDDLE "Unc".

258. At approximately 8:25 P.M., Xzayvier WEDDLE called SA ████ from 414-722-0553. Xzayvier WEDDLE informed SA ████ the cost of the narcotics being sought by SA ████ would cost a total of $4,500.

259. SA ████ later examined the CDRs for 414-722-0553, 414-517-5178, and 414-627-7500 around the time SA ████ had spoken to Xzayvier WEDDLE. The call detail records identified on January 20, 2022, SA ████ spoke with X Xzayvier WEDDLE via 414-722-0553

from "08:22:01 P.M." until "08:23:24 P.M." Per call detail records, 414-722-0553 did not make any outgoing calls, nor did it receive any incoming calls until Xzayvier WEDDLE called SA ████ back at "08:25:49 P.M."

260.    The call detail records identified that at "08:24:27 P.M.," approximately one minute after SA ████ spoke with Xzayvier WEDDLE, 414-517-5178 made an outgoing call to **414-323-9313**. The call ended at "08:25:34 P.M.," which is approximately 15 seconds prior to when Xzayvier WEDDLE called SA ████ back from 414-722-0553 with the cost of the narcotics (8:25:49 P.M.).

261.    SA ████ knows from numerous undercover telephone contacts that the ADTO member who possesses the mobile devices associated with 414-722-0553 and 414-517-5178 often utilizes both devices and numbers while they are working their designated "shift," selling narcotics.

262.    SA ████ then examined the cell-site location data for 414-722-0553 and 414-517-5178 during the time frame when the aforementioned calls took place. The cell-site location data identified that both Target Devices were in the same cell-sector when 414-517-5178's call with **414-323-9313** ended (8:25:34 P.M.) and 414-722-0553's call to SA ████ began (8:25:49 P.M.). For a visual aid, please reference Figure 23:



*(Figure 23)*

*Cell-Site Location Mapping Data for 414-722-0553 (Teal) and 414-517-5178 (Purple)on January 20, 2022. Both devices within the same cell-sector from 8:24 P.M – 8:25 P.M.*

263.     Please note, on January 23, 2022, SA ▮▮▮▮ queried **414-323-9313** via ZetX.com, which is a website utilized by law enforcement to identify a telephone number's mobile carrier. ZetX.com identified the mobile carrier for **414-323-9313** as Verizon Wireless.

264.     On January 21, 2022, beginning at approximately 10:12 A.M., SA ▮▮▮▮ communicated via text message with 414-517-5178 to coordinate the purchase of one ounce of crack cocaine and two ounces of cocaine from the ADTO.

265.     At approximately 12:43 P.M., SA ▮▮▮▮ texted 414-517-5178, stating ▮▮▮▮ would be arriving at Walmart, located at 4140 W Greenfield Avenue, West Milwaukee, WI, in less than 20 minutes. SA ▮▮▮▮ received a text message reply from 414-517-5178 at approximately 12:48, which stated "Ok what we doing." In this context, SA ▮▮▮▮ understood this

to mean the ADTO member utilizing the cellular device associated with 414-517-5178 was asking SA ███ what ███ was seeking to purchase.

266.    At approximately 12:50 P.M., SA ███ called 414-517-5178 to discuss the specifics of the transaction with the current user of the mobile device associated with 414-517-5178. Upon the call being connected, SA ███ spoke to ALEX WEDDLE. Realizing ███ was speaking with Alex WEDDLE, SA ███ asked, "Did you talk to Nephew (Xzayvier WEDDLE)? I uhh placed an order last night. I said I needed two zips of the soft and then I need another onion on top of it." SA ███ knows through training and experience that an "onion" is street vernacular for an ounce of crack cocaine.

267.    Alex WEDDLE did not directly answer the question; rather, Alex WEDDLE asked what Xzayvier WEDDLE told SA ███ the cost would be for the narcotics SA ███ was seeking to purchase. SA ███ stated Xzayvier WEDDLE had stated the total for SA ███ order would be $4,500. Alex WEDDLE then stated in agreement, "Ok. Alright."

268.    Alex WEDDLE then asked, "C'mon how long you gonna be?" SA ███ answered ███ would be arriving in approximately 15 minutes. SA ███ then asked if Alex WEDDLE would be at "that Walmart," referencing the Walmart located at 4140 West Greenfield Avenue, West Milwaukee, WI, which is where the three previous undercover purchases from the ADTO had taken place. Alex WEDDLE then answered, "Yep."

269.    At approximately 12:53 P.M., SA ███ departed the operation's staging location in an UCV as he was followed by a designated cover team. SA ███ was equipped with audio-/video-recording/transmitting devices, which was activated at 12:56 P.M., and an amount of pre-recorded ATF buy money.

270.    At approximately 1:01 P.M., SA ███ received an incoming call from 414-517-

5178. Upon the call being connected, SA ███ identified the individual he was speaking with as Alex WEDDLE. Alex WEDDLE stated that he was previously unaware that SA ███ would be arriving so soon. Alex WEDDLE then stated, in substance, because ALEX WEDDLE was not expecting SA ███ to arrive this early, Alex WEDDLE needed an "extra ten minutes."

271.    At approximately 1:09 P.M., SA ███ arrived at Walmart, located at 4140 W Greenfield Ave, and parked on the south side of the building, adjacent to the Lawn & Garden section of the business.

272.    At approximately 1:16 P.M., SA ███ texted 414-517-5178, "Wya (where you at)?" At approximately 1:18 P.M., SA ███ received a response stating, "I'm at my house grabbing it now."

273.    At approximately 1:47 P.M., SA ███ called 414-517-5178 and spoke with Alex WEDDLE. SA ███ then asked Alex WEDDLE when Alex WEDDLE would be arriving. Alex WEDDLE apologized for being late and claimed he was "six or seven minutes" away.

274.    At approximately 1:58 P.M., SA ███ received a text message from 414-517-5178, stating, "Getting off capital im 5." In this context, SA ███ understood this to mean Alex WEDDLE was exiting Interstate-43 via Capitol Drive in Milwaukee, WI. SA ███ had previously met with Alex WEDDLE and other ADTO members at a Walmart store located off Capitol Drive in Milwaukee, WI, several times to purchase narcotics over the previous three months. Based on this message, SA ███ understood this to mean Alex WEDDLE was traveling towards the incorrect Walmart location.

275.    Immediately after receiving this text, SA ███ called 414-517-5178 to verify Alex WEDDLE was traveling to the correct Walmart location. Upon the call being connected, Alex WEDDLE stated he was two exits away from Capitol Drive. SA ███ then informed Alex

WEDDLE that SA ███ was at the Walmart store located off Miller Park Way. Alex WEDDLE then stated he believed SA ███ was at the Walmart off Capitol Drive in Milwaukee, WI because the last time Alex WEDDLE had met with SA ███ it occurred near the Walmart off Capitol Drive.

276.     SA ███ then asked Alex WEDDLE to meet him at the Walmart off Miller Park Way. WEDDLE countered and asked SA ███ come to a location closer to where Alex WEDDLE was currently at. After back-and-forth negotiations, SA ███ and Alex WEDDLE agreed to meet near the intersection of South 27th Street/Layton Boulevard and National Avenue in Milwaukee, WI.

277.     At approximately 2:03 P.M., SA ███ departed Walmart located at 4140 W Greenfield Ave and traveled towards Family Dollar, which is located at 743 South Layton Boulevard, Milwaukee, WI. Please note, Family Dollar is located within a strip mall on the northwest corner at the intersection of South Layton Boulevard and National Aveune.

278.     SA ███ arrived at Family Dollar at approximately 2:08 P.M, and subsequently texted Alex WEDDLE 414-517-5178 to inform him that SA ███ was at Family Dollar. At approximately 2:15 P.M., SA ███ received a text message from Alex WEDDLE, which stated, "Here."

279.     Approximately two minutes later, SA ███ called 414-517-5178 and spoke to Alex WEDDLE. Alex WEDDLE stated he was at Family Dollar but did not see SA ███ UCV. SA ███ then guided Alex WEDDLE to SA ███ location as SA ███ observed a black Toyota Corolla, matching the characteristics of the Toyota utilized by the ADTO, driving slowly through the lot.

280.     At approximately 2:17 P.M., SA ███ observed the black Toyota Corolla drive

behind the UCV before Alex WEDDLE parked the Toyota directly next to the UCV's driver-side. SA ████ then exited the UCV and joined Alex WEDDLE by entering the Toyota's front-passenger seat. It is important to note that prior to SA ████ entering the Toyota, SA ████ observed through the front-passenger window that Alex WEDDLE possessed approximately 1/4th of a kilogram (nine ounces) of suspected cocaine on his lap (Figure 24).



*(Figure 24)*
*Screenshot taken from the video-recordings (through front passenger window) showing approximately 1/4th of a kilogram of suspected cocaine on* Alex *WEDDLE's lap.*

281.    SA ████ identified the suspected cocaine on ALEX WEDDLE's lap was at least 1/4th of a kilogram through training and experience and by observing the following:

i. Alex WEDDLE broke-off and provided SA ████ with 83.35 grams (approximately 3 ounces) of suspected cocaine from the quarter-kilogram of cocaine observed on Alex WEDDLE's lap.

ii. SA ████ observed that Alex WEDDLE still possessed approximately two-thirds (2/3) of the amount of suspected cocaine that WEDDLE had on his lap prior to the transfer of the 83.35 grams of cocaine.

iii. This allowed SA ████ to conclude that the amount of suspected cocaine Alex WEDDLE possessed prior to the transaction was approximately 9 ounces.

282. After SA ███ joined Alex WEDDLE in the Toyota, SA ███ exchanged greetings with Alex WEDDLE. SA ███ also observed that Alex WEDDLE possessed several cell phones, and Alex WEDDLE was utilizing an Apple iPhone to Facetime an unknown black female, that Alex WEDDLE later referred to as "baby." SA ███ observed the unidentified female Facetiming with Alex WEDDLE was not MACK-HOWARD.

283. As Alex WEDDLE spoke with SA ███ Alex WEDDLE placed a black digital scale on the center console between Alex WEDDLE and SA ███ Alex WEDDLE then held the large brick-shaped piece of suspected cocaine and began removing the plastic wrap that had previously covered the substance. It is important to note that SA ███ observed the amount of plastic wrap covering the suspected cocaine was significantly more than was needed to wrap the amount Alex WEDDLE possessed, leading SA ███ to believe Alex WEDDLE previously possessed even more suspected cocaine prior to meeting SA ███ Alex WEDDLE then broke off a piece and placed it on top of the scale. SA ███ then observed the scale read "83.35" grams.

284. As Alex WEDDLE was in the process of removing the brick-shaped piece of cocaine from the plastic wrap, he told SA ███ to "Keep looking out. Keep looking out for me." In this context, SA ███ understood this to mean Alex WEDDLE was telling SA ███ to be on the look-out for law enforcement vehicles and/or potential robbers. SA ███ then asked if Alex WEDDLE's vehicle possessed tint. Alex WEDDLE stated the vehicle did not have tint. Alex WEDDLE then explained that he did not want tint on the vehicle's windows because, "Sometimes the obvious is the less obvious."

285. Also, during this time, Alex WEDDLE received several telephone calls on the various mobile phones on his lap. At approximately 2:18 P.M., Alex WEDDLE received an incoming call and SA ███ was able to partially observe the contact's name on Alex WEDDLE's

phone was "Ant 14th Street." Alex WEDDLE greeted the individual as "Ant," and informed "Ant" that Alex WEDDLE would soon be in the "East." At approximately 2:19 P.M., Alex WEDDLE received another call, and without letting the caller speak, Alex WEDDLE shouted, "Come in the back" before Alex WEDDLE hung up.

286.    After Alex WEDDLE placed the suspected cocaine on the digital scale, he asked, "Three of the soft, right?" Through training and experience in addition to the context of the transaction, SA ████ understood this to mean Alex WEDDLE was confirming SA ████ wanted to purchase three ounces of cocaine ("soft"). SA ████ then corrected Alex WEDDLE, informing Alex WEDDLE that SA ████ wanted to purchase one ounce of crack cocaine and two ounces of powder cocaine.

287.    Alex WEDDLE then reached in the storage area at the bottom of the driver's door and retrieved a knotted-off plastic bag containing a small amount of a white rock-like substance (suspected crack cocaine). Alex WEDDLE then placed the suspected crack cocaine on the scale before he immediately took it off. SA ████ understood this action by Alex WEDDLE to be indicative of Alex WEDDLE not readily possessing one ounce of crack cocaine.

288.    When SA ████ realized Alex WEDDLE did not readily possess an ounce of crack cocaine, SA ████ informed Alex WEDDLE that SA ████ would purchase the nearly three ounces of suspected cocaine on the digital scale if Alex WEDDLE sold the suspected cocaine to SA ████ for a reduced price. Alex WEDDLE replied to SA ████ proposition, stating, "That's the deal I'm cutting you on. I'm cutting you the biggest deal of them all."

289.    SA ████ then contested Alex WEDDLE's suggestion that Alex WEDDLE was cutting SA ████ a deal when SA ████ explained that "Nephew", Xzayvier WEDDLE, had told SA ████ the evening prior that one ounce of crack cocaine and two ounces of powder cocaine

would cost a total of $4,500. SA ██████ knows through training and experience that when an individual purchases large amounts of cocaine (i.e., one ounce or more), the price of powder cocaine is typically less than the cost of the same amount/weight of crack cocaine. Because SA ██████ knows this to be true, SA ██████ was conveying to Alex WEDDLE that if SA ██████ was purchasing three ounces of cocaine in lieu of one ounce of crack cocaine and two ounces of powder cocaine, then the total cost of the three ounces of cocaine should be less than the $4,500 that was quoted for the former.

290.    Alex WEDDLE then stated, in substance, that he was still giving SA ██████ a reduced price for the three ounces of cocaine even though Alex WEDDLE admitted that he had previously stated that the cost for the ounce of crack cocaine and two ounces of powder cocaine would be $4,500. Ultimately, SA ██████ agreed to pay $4,500 for the suspected cocaine.

291.    SA ██████ then took the suspected cocaine off Alex WEDDLE's scale and placed it in ██████ coat pocket. SA ██████ then handed Alex WEDDLE $4,500 in pre-recorded buy money and asked Alex WEDDLE to verify the amount. Alex WEDDLE then took the buy money from SA ██████ and confirmed the amount was $4,500.

292.    SA ██████ then expressed frustration regarding SA ██████ order being delayed and incorrect. SA ██████ voiced that ██████ spoke to multiple ADTO members since the evening prior to ensure SA ██████ order would be ready to be picked up when SA ██████ arrived. SA ██████ asked if ██████ could obtain one sole telephone number SA ██████ could call to alleviate SA ██████ speaking with different ADTO members, which could lead to future confusion or miscommunications. Alex WEDDLE replied, stating, in substance, that the ADTO members work different shifts and because the ADTO was "busy as fuck," Alex WEDDLE could not prevent delays or miscommunications among his workers.

293. At approximately 2:21 P.M., Alex WEDDLE and SA ▮▮▮ exchanged good-byes and thanked each other for the transaction. SA ▮▮▮ then exited the Toyota and re-entered the UCV. SA ▮▮▮ then observed Alex WEDDLE depart the parking lot after he turned south onto South Layton Boulevard.

294. After the operation, SAs ▮▮▮ and I weighed and field tested the purchased suspected cocaine, which weighed 83.35 grams (without packaging) and field-tested positive for cocaine.

## C. IDENTIFICATION OF "ZAY BAY" AND "NEPHEW" AS XZAYVIER WEDDLE

295. After the undercover operation on December 8, 2021, (described in subsection h) SA ▮▮▮ queried "Zay" via Facebook's search tool. During SA ▮▮▮ review of profiles containing this parameter, SA ▮▮▮ identified a Facebook profile (Figure 25) with the vanity name of "Zay Otw" and User ID: https://www.facebook.com/**xzayvier.weddle**.98. SA ▮▮▮ was unable to review the account's contents due to privacy settings.



*(Figure 25)*
*Screenshot of the Facebook account with vanity name "Zay Otw".*

296. After reviewing the account, SA ▮▮▮ continued to search Facebook accounts within the same parameters. SA ▮▮▮ subsequently identified a Facebook account with the vanity

name "Pf Zay" and Facebook user account ID 100043848067731. SA ███ began reviewing photographs posted from the account and identified an individual in several of the public photographs as the individual referred to as "Zay" and "Nephew" by PEREZ-RAMIREZ earlier that day (Figure 26). Based on my training and experience, it appearance that "Zay" is holding a suspected AK-style firearm over his right shoulder. SA ███ also observed within the account's "Basic Info" section that the user's birthday was March 7, 2004.



*(Figure 26)*
*Photographs taken from Facebook vanity name "Pf Zay" and user account ID 100043848067731.*

297.     Upon further review of the account, SA ███ identified a Facebook user vanity name "SlapperOf TheYear" was tagged in several posts that had been made public on the account. SA ███ subsequently conducted a review of "SlapperOf TheYear's" account and identified the individual in the account's photographs to be "Zay" and "Nephew" (Figure 27). The Facebook user ID for "SlapperOf TheYear" is 100039395971081 and the URL for the account was

https://www.facebook.com/pf.zayy.



*(Figure 27)*
*Photographs taken from Facebook vanity name "SlapperOf TheYear" and user ID 100039395971081.*

298.    The last public post on the account with vanity name "Pf Zay" was made on November 29, 2021, and the last public post on the account with vanity name "SlapperOf TheYear" was made on November 3, 2021. Due to privacy settings, SA ▇ was unable to view all content posted to the accounts.

299.    On December 8, 2021, SA ▇ queried "Xzayvier WEDDLE" within WI Department of Transportation (DOT) records. From within the records, SA ▇ was able to obtain a driver's license photograph of Xzayvier WEDDLE.   The DOT photo of Xzayvier WEDDLE matches the photos posted on the Facebook of "Pf Zay", user account ID 100043848067731, and "SlapperOfTheYear", user account ID 10003939597108. DOT records identified Xzayvier WEDDLE's birthday as March 7, 2005, and a contact address of 3268 North 35th Street, Milwaukee, WI.  The Facebook photos located on user account ID 100043848067731, and 10003939597108 and the DOT photo of Xzayvier WEDDLE also matches the individual SA ▇ observed during the undercover controlled buys on November 17, 2021(reference in section

B subsection g) and December 8, 2021 (reference in section B subsection h).

300.    On December 8, 2021, SA ▮▮ queried Xzayvier WEDDLE's criminal history with National Criminal Information Center (NCIC), which identified WEDDLE does not have a known criminal history.

### D.  IDENTIFICATION OF LEMAR HOWZE (M/B; DOB 08/03/1981)

301.    On November 30, 2021, the Honorable Judge Stephen C. Dries authorized a warrant for electronic surveillance for the ADTO's cell phones, 414-517-5178, 414-722-0553, 414-627-7500, and 414-839-8056, which were served on T-Mobile..  On January 9, 2022, SA ▮▮ reviewed telephone numbers identified most frequently in contact between 414-517-5178, 414-722-0553, 414-627-7500 and 414-839-8056 (combined) through the historical call detail records that were provided by T-Mobile after T-Mobile was served with a federal search warrant for records and information associated with the cellular devices assigned call numbers 414-517-5178, 414-722-0553, 414-627-7500 and 414-839-8056.  SA ▮▮ then attempted to run all 50 of those numbers through law enforcement databases in an attempt to identify who each number was registered to.  When SA ▮▮ reached the 41st most frequently in contact number, 414-745-5175, he found that it registered to Lemar HOWZE.  SA ▮▮ then ran HOWZE's information through DOT and NCIC records.  SA ▮▮ found that in reviewing the criminal history of HOWZE, he has the following felony convictions through the State of Wisconsin.

   a.  2018- Possession of Methamphetamine
   b.  2006- Manufacture/Deliver Cocaine (<=1g) [Modifiers: Party to a Crime]
   c.  2001-Escape-Criminal Arrest [Modifiers: Party to a Crime]
   d.  2001-Possess w/Intent-Cocaine (<=5g)-2nd
   e.  2001-Possess w/Intent-THC (<=500 grams)-2nd
   f.  2001-Possession of Firearm by Felon
   g.  Plus, several felony arrests as a juvenile

302.     SA ▮▮▮ also found that in 2016 HOWZE pled guilty to a federal felon in possession charge through the Eastern District of Wisconsin.

303.     After reviewing HOWZEs criminal history, SA ▮▮▮ looked on Facebook to see if HOWZE had a Facebook profile.  SA ▮▮▮ found that HOWZE did have a profile and that the account was open to be viewed by the public.  Through this SA ▮▮▮ was able to view several photographs of HOWZE.  SA ▮▮▮ recognized HOWZE from the crack cocaine purchase on September 1, 2021, and September 17, 2021 (reference section B subsections a and c).  SA ▮▮▮ was able to confirm that HOWZE was individual with Alex WEDDLE and PEREZ-RAMIREZ through the several photographs showing HOWZE's facial hair, gold teeth, and a specific brewers hat that HOWZE wore on the September 17, 2021, crack cocaine deal.  SA ▮▮▮ recognized the tattoos on HOWZE's left forearm pictured on HOWZE's account from the undercover crack cocaine deal on September 17, 2021.  SA ▮▮▮ also observed that in NCIC a gravestone tattoo is listed as a tattoo on HOWZE's right forearm.  SA ▮▮▮ immediately remembered there being a gravestone tattoo on HOWZE's forearm from the surveillance footage of the undercover deal.  Also, on HOWZE's account, there were multiple photographs of HOWZE with Alex WEDDLE taken in the yard of 2508 N 6th St. Milwaukee WI.  This address is listed a residence of HOWZE in his criminal history.

E.  **FACEBOOK   CONVERSATION   BETWEEN   XZAYVIER   WEDDLE'S FACEBOOK ACCOUNTS AND HOWZE**

304.     On January 9, 2022, the Honorable Judge Nancy Joseph authorized a search warrant for Facebook accounts 100039395971081 and 100043838067731 belonging to Xzayvier WEDDLE.  On January 11, 2022, I reviewed Facebook account 100043838067731 and observed that there are conversations between that account and the account identified to be that of HOWZE. In one message exchanged between HOWZE's account and Xzayvier WEDDLE's Facebook

Account 100043838067731, HOWZE writes "I got some gas cll me". I know through training and experience that "gas" is a common slang for marijuana, and that, in the previously-referenced message, HOWZE is inviting Xzayvier WEDDLE to call him if he would like to procure some marijuana.

305. On January 12, 2022, I reviewed Facebook account 100039395971081 and observed that it also had conversations with HOWZE's account. These conversations were as recent as December of 2021.

## F. WARRANT FOR ELECTRONIC SURVEILLANCE OF THE ADTO'S CELL PHONES, 414-517-5178, 414-722-0553, 414-627-7500, AND 414-839-8056 AND LAW ENFORCEMENT SURVEILLANCE

306. On November 30, 2021, Honorable Judge Stephen C. Dries authorized a warrant for electronic surveillance for the ADTO's cell phones, 414-517-5178, 414-722-0553, 414-627-7500, and 414-839-8056, which were served on T-Mobile. Case agents utilized the court-authorized electronic surveillance of the ADTO's above cell phones, which upon review of the results, supports information provided from the CHSs and demonstrated the continual ongoing nature of this armed drug trafficking organization.

307. On December 17, 2021, at approximately 8:15 A.M., SA ███ acting in an undercover capacity, called telephone No. 414-722-0553; however, there was no answer. SA ███ called the same number approximately five minutes later; however, there was no answer.

308. At approximately 8:26 A.M., SA ███ received an incoming call from 414-722-0553. SA ███ answered the call and was greeted by PEREZ-RAMIREZ. SA ███ asked PEREZ-RAMIREZ what the cost would be for one ounce of powder cocaine. PEREZ-RAMIREZ stated he would need to obtain the price from "Bro" and call SA ███ back with the price. Please note, SA ███ knows from information gleaned over the course of this investigation that PEREZ-

RAMIREZ refers to Alex WEDDLE as "Bro."

309. On the afternoon of December 17, 2021, SA ███ reviewed the historical cell-site data (commonly referred to as "pings") for the device associated with 414-722-0553 and 414-517-5178 around the time of SA ███ telephone call with PEREZ-RAMIREZ. The pings identified the devices associated with the telephone numbers were within the vicinity of 1437 South 71st Street, West Allis, WI, during the time of the call.

310. SA ███ then reviewed surveillance footage from an ATF pole camera in place at 1437 South 71st Street and observed PEREZ-RAMIREZ exiting the front door of the residence at approximately 8:59 A.M. PEREZ-RAMIREZ, who wore a white/beige hooded sweatshirt, then walked over to a red Nissan Altima, which was parked in front of the residence on South 71st Street and entered the driver's seat before he conducted a U-Turn and drove north on South 71st Street.

311. Continuing in the afternoon of December 17, 2021, SA ███ reviewed surveillance footage from an ATF pole camera at 2519 North 2nd Street, Milwaukee, WI. It should be noted that 2519 North 2nd Street is an apartment complex, and Janicia MACK-HOWARD is the listed utilities-owner for apartment No. 4.

312. SA ███ observed on December 17, 2021, at approximately 9:12 A.M., a red Nissan, matching the characteristics of the Nissan PEREZ-RAMIREZ was operating approximately twelve minutes earlier, arrived at 2519 North 2nd Street, and parked facing south on North 2nd Street.

313. At approximately 9:20 A.M., SA ███ observed a white Audi Q7, matching the characteristics of MACK-HOWARD's Audi Q7, arrive at 2519 North 2nd Street and parked directly behind the Nissan. At approximately 9:22 A.M., an individual matching the physical

characteristics of Alex WEDDLE exited the front passenger seat of the Audi, walked over to the

Nissan, and entered the front passenger seat (Figure 28). At 9:23 A.M., an individual matching the

physical characteristics of MACK-HOWARD exited the driver's seat of the Audi, walked over to

the rear-passenger side of the Nissan, and entered the vehicle (Figure 29). At approximately 9:23

A.M., the Nissan drove south on North 2nd Street before it turned west onto West Wright Street.

SA ▮▮▮▮ observed the driver of the Nissan wore a hooded sweatshirt that was the same color that

PEREZ-RAMIREZ was observed wearing at approximately 8:59 A.M.



*(Figure 28)*
*Alex WEDDLE approaching red Nissan after arriving at 2519 N 2nd Street in white Audi*



*(Figure 29)*
*MACK-HOWARD approaching red Nissan after arriving at 2519 N 2nd Street in white Audi*

314.    Returning to the morning of December 17, 2021, at approximately 9:37 A.M., SA

▓▓▓ received an incoming call from 414-722-0553; however, the call was not completed due to technical issues. SA ▓▓▓ immediately called 414-722-0553 back and was greeted by Alex WEDDLE. Alex WEDDLE asked SA ▓▓▓ "What was you trying to do bro?" SA ▓▓▓ informed Alex WEDDLE that ▓▓▓ wanted to obtain the price for an ounce of powder cocaine. Alex WEDDLE informed SA ▓▓▓ that an ounce of powder cocaine would cost $1,500. SA ▓▓▓ then thanked Alex WEDDLE and informed him that SA ▓▓▓ would call him later when SA ▓▓▓ wanted to purchase the narcotics.

315.    On the afternoon of December 17, 2021, SA ▓▓▓ reviewed the cellular pings for telephone numbers 414-722-0553, 414-517-5178, and 414-627-7500. The historical pings identified that around the time SA ▓▓▓ spoke with Alex WEDDLE, approximately 9:37 A.M., all devices associated with the aforementioned numbers were in the vicinity of 3266/3268 North 35th Street, Milwaukee, WI, (Figure 30).



*(Figure 30)*
*Screenshot from cellular ping data showing the devices from the ADTO's cell phones 414-722-0553, 414-517-5178, and 414-627-7500 within the vicinity of 3266/3268 North 35th*

## G. REVIEW OF CELLULAR LOCATION DATA AND POLE CAMERAS

316.    On December 26, 2021, SA ▮▮▮ reviewed the cellular pings for telephone numbers 414-722-0553 and 414-517-5178.  SA ▮▮▮ observed the pings for telephone numbers 414-722-0553 and 414-517-5178 were in the vicinity of 2519 North 2nd Street, Milwaukee, WI, multiple times on December 26, 2021. SA ▮▮▮ reviewed surveillance footage from the pole camera installed at 2519 North 2nd Street, Milwaukee, WI, and observed that the red Nissan Altima, bearing WI license plate of AMW9537, was parked near the address, each time.

## H. REVIEW OF POLE CAMERA FOOTAGE ON JANUARY 4, 2022 AND IDENTIFICATION OF GERALD JONES

317.    On January 4, 2022, SA ▮▮▮ reviewed surveillance footage from the pole camera installed at 3266/3268 North 35th Street, Milwaukee, WI. Please note, all following times referenced are approximate times from the pole camera footage. At approximately 10:00 A.M., an unknown individual walked east, through the backyard of the residence, into the east-alley that runs behind the residence. The individual began inspecting the disabled white Volkswagen Passat that is parked on a concrete slab between the residence and the east-alley.

318.    At approximately 10:23 A.M., Alex WEDDLE, wearing a black coat and blue jeans, is observed by SA ▮▮▮ walking east through the backyard before he joined the individual inspecting the Volkswagen (Figure 31).



(Figure 31)

*Alex WEDDLE (circled in red) speaking with the individual inspecting the Volkswagen*

319.   At approximately 10:34 A.M., after Alex WEDDLE finished meeting with the vehicle inspector, Alex WEDDLE walked west through the backyard and exited view of the camera as he entered the gangway, located south of the residence.

320.   Approximately two minutes after Alex WEDDLE exited view of the camera, at approximately 10:36 A.M., SA ████ observed a vehicle bearing identical characteristics the Audi as it conducted a U-turn to travel south on North 35th Street (Figure 32).



(*Figure 32*)
*The Audi as it conducts a U-Turn to travel south on N 35th Street*

321.    Continuing on January 4, 2022, SA ▮▮▮ reviewed surveillance footage from the pole camera installed at 2519 North 2nd Street, Milwaukee, WI. During a review of the footage, SA ▮▮▮ observed a red Nissan Altima bearing WI registration "AMW9537" (registered to OBREGON) arrive at the apartment complex and park on the west side of North 2nd Street.  At approximately 11:04 A.M., the Audi arrived at North 2nd Street and parked on the west side of the street, behind the Nissan.  SA ▮▮▮ then observed Alex WEDDLE, wearing the same black jacket and blue jeans referenced in paragraph 346, exit the driver's seat of the Audi as an unknown black male wearing a mutli-colored Chicago Bulls (NBA Team) jacket exited the front passenger seat. Alex WEDDLE then entered the rear-passenger seat of the red Nissan, which drove off shortly after Alex WEDDLE had entered. Please note, the unknown black male wearing the Bulls jacket was later observed on the surveillance footage being picked up in the apartment complex's parking lot in a new-model Range Rover SUV with black rims and heavy-dark tint. SA ▮▮▮ could not

make-out the vehicle's license plate; however, SA ▮▮▮ was able to observe the license plate possessed characteristics of a State of Wisconsin license plate.

322.     On the same date, at approximately 12:05 P.M., MACK-HOWARD was observed by SA ▮▮▮ walking through the apartment complex's parking lot as she approached the Audi Q7, which remained parked in the same place after Alex WEDDLE left in the Nissan. MACK-HOWARD then departed in the Audi; however, at approximately 12:37 P.M., MACK-HOWARD returned to 2519 North 2nd Street and parked near the same location where Alex WEDDLE had parked earlier. MACK-HOWARD and another unidentified black female then exited the Audi and walked back through the apartment complex's parking lot as the approached the entrance of the complex.

323.     On the same date, at approximately 1:00 P.M., the red Nissan returned to 2519 North 2nd Street and temporarily parked on the east side of the street. The only individual who exited the vehicle was the rear-passenger, Gerald JONES, who was later identified after an undercover purchase on January 5, 2022. JONES then walked around the vehicle and entered the driver's seat of the Nissan, which departed shortly after this individual entered the driver's seat. Because no one exited the driver's seat at any point, SA ▮▮▮ inferred the driver of the Nissan moved to a different seat within the vehicle without exiting the vehicle.

324.     Please Note, Gerald JONES was identified on January 5, 2022, after JONES accompanied PEREZ-RAMIREZ and Xzayvier WEDDLE during an undercover operation consisting of SA ▮▮▮ purchasing narcotics from PEREZ-RAMIREZ. During this undercover purchase, (section B subsection i) JONES wore a distinct black adidas sweatshirt and white pants as he sat on top of a red, puffy coat. Investigators, through pole camera surveillance, have observed an individual, matching JONES physical characteristics, wear these same articles of clothing on

numerous dates beginning in November of 2021. Additionally, JONES social media accounts were located, and SA ████ identified the individual in JONES's Facebook account was the same individual who accompanied PEREZ-RAMIREZ and Xzayvier WEDDLE during the undercover operation on January 5, 2022.

325.    Continuing on January 4, 2022, SA ████ reviewed surveillance footage from the pole camera installed at 1437 South 71st Street, West Allis, WI. During his review of the footage, SA ████ observed, at approximately 11:30 A.M. (approximately 30 minutes after Alex WEDDLE was observed getting in the red Nissan at 2519 North 2nd Street), the red Nissan arrived at 1437 South 71st Street. After the Nissan arrived at the residence, OBREGON exited the front passenger seat and entered the residence through the front door (after checking the residence's mailbox). Approximately two minutes later, Xzayvier WEDDLE exited the front door of the residence and opened the front passenger seat of the Nissan; however, Xzayvier WEDDLE then closed the Nissan's door and ran back inside the residence.

326.    At approximately 11:34 P.M., PEREZ-RAMIREZ (driver) and Alex WEDDLE (rear passenger) exited the red Nissan (Figure 33). Alex WEDDLE, still wearing the same black jacket and blue jeans, proceeded to enter the Nissan's driver seat as PEREZ-RAMIREZ went inside the residence through the front door.



(*Figure 33*)
*PEREZ-RAMIREZ (left) and Alex WEDDLE (right) as the exited the Nissan*

327.     Moments after PEREZ-RAMIREZ entered the residence, he came back outside as

he held a large baggie in his hands and approached the driver's window, which Alex WEDDLE

subsequently rolled down (Figure 34).



(*Figure 34*)
*PEREZ-RAMIREZ approaching driver's window as he clutches a large plastic baggie in his right hand (circled in red)*

328.     After Alex WEDDLE rolled the window down, PEREZ-RAMIREZ handed Alex WEDDLE the large plastic baggie through the window. Shortly after, PEREZ-RAMIREZ went back inside the residence only to re-emerge outside moments later accompanied by JONES. PEREZ-RAMIREZ then went back to the driver's window, which Alex WEDDLE had rolled back down, and proceeded to speak with Alex WEDDLE. Please note, as PEREZ-RAMIREZ spoke with Alex WEDDLE, PEREZ-RAMIREZ reached inside his pants pocket and then appeared to hand an object to Alex WEDDLE through the driver's window. It is also important to note the timing of this hand-off; PEREZ-RAMIREZ waited until cars traveling on South 71st Street (behind him) had passed by to pass the object off to Alex WEDDLE.

329.     After PEREZ-RAMIREZ finished speaking with WEDDLE, he re-entered the residence through the front door and the Nissan conducted a U-turn to travel north on South 71st Street.

## I.   REVIEW OF POLE CAMERA FOOTAGE ON JANUARY 5, 2022, PRIOR TO EIGHTH UNDERCOVER PURCHASE

330.     On the afternoon of January 5, 2022, SA ███ reviewed surveillance captured earlier that day from the pole camera installed at 2519 North 2nd Street, Milwaukee, WI. Please note, all following times referenced are approximate times from the pole camera footage.

331.     At approximately 12:40 P.M., SA ███ observed the same red Nissan Altima arrive at 2519 North 2nd Street and park in the middle of the street beside MACK-HOWARD's Audi Q7, which was already parked at 2519 North 2nd Street.

332.     After the Nissan parked, Alex WEDDLE, still wearing the same black jacket and blue jeans he wore the previous day, exited the front passenger seat of the Nissan, and opened the driver's door of the Audi (Figure 35). Alex WEDDLE then reached inside the driver's seat area of the Audi before he walked back over to the Nissan and reached inside the front passenger area of

the Nissan. Moments later, Alex WEDDLE walked back over to the driver's door of the Audi, where he continued to rummage around the inside of the driver's seat area. After WEDDLE finished digging around the driver's seat area of the Audi for the second time, he walked back to the front passenger door of the Nissan and entered the front passenger seat. I know through training and experience that drug dealers commonly store narcotics in hidden compartments within vehicles, which are commonly referred to as "traps." I know that "traps" are used to refer to hidden compartment narcotics traffickers install within their vehicles to conceal their narcotics. I know that "traps" are commonly located underneath seats of a given vehicle. Based on their training and experience, as well as the drug purchase accomplished later that day, Investigators believe Alex WEDDLE's observed behavior, as described above, is consistent with the utilization of such a "trap" in the Audi.



(*Figure 35*)
*Alex WEDDLE (circled in red) as he reached inside the driver's seat area of the Audi*

333.     It is also important to note that the unknown black male wearing the Chicago Bulls jacket (reference paragraph 349) that was observed with Alex WEDDLE the previous day exited the rear passenger seat of the Nissan at approximately 12:42 P.M., before he walked through the apartment complex's parking lot towards the building entrance.

334.     Continuing on January 5, 2022, at approximately 1:00 P.M., SA ▮▮▮ observed the red Nissan Altima arrive back at 2519 North 2nd Street. SA ▮▮▮ then observed Alex WEDDLE exit the Nissan and enter the driver's seat of the Audi. After WEDDLE entered the Audi, both the Nissan and Audi vehicles departed the area in opposite directions.

## J.  POLE CAMERA SURVEILLANCE AND CELL-SITE LOCATION DATA FROM JANUARY 10, 2022 – <u>TARGET LOCATION A</u>

335.     On January 11, 2022, SA ▮▮▮ reviewed historical cell-site data ("pings") for telephone numbers 414-722-0553, 414-517-5178, and 414-627-7500. The time period reviewed by SA ▮▮▮ was 6:00 P.M., through 8:00 P.M., on January 10, 2022.

336.     After reviewing the historical pings, SA ▮▮▮ observed that on January 10, 2022, from approximately 6:00 P.M., until approximately 7:00 P.M., the mobile devices associated with telephone numbers 414-517-5178 and 414-627-7500 were separated as they traveled around the Milwaukee, Wisconsin (WI), metropolitan area.

337.     SA ▮▮▮ observed then reviewed surveillance footage for this same time period from pole cameras that had previously been installed at 1437 South 71st Street, West Allis, WI, and 2519 N 2nd Street, Milwaukee, WI.

338.     During a review of the pole camera footage, SA ▮▮▮ observed that on January 10, 2022, at approximately 6:11 P.M., the red Nissan Altima registered to OBREGON arrived at 1437 South 7st Street. OBREGON then exited the Nissan's driver's seat and entered the residence through the front door. Approximately one minute later, the red Nissan conducted a U-turn and

drove north on South 71st Street. SA ████ concluded that because no one exited the Nissan besides OBREGON, another individual already inside the Nissan moved into the driver's seat from another seat within the vehicle. SA ████ then cross-referenced the cellular location data for 414-517-5178 and observed during this time, the mobile device associated with 414-517-5178 was within the vicinity of 1437 South 71st Street. SA ████ identified while the mobile device associated with 414-517-5178 was in the vicinity of 1437 South 71st Street, the mobile device associated with 414-627-7500 was in North Milwaukee, which is a substantial distance from 1437 South 71st Street.

339.     SA ████ continued watching the pole camera footage from 1437 South 71st Street and observed at approximately 6:43 P.M., a 2020 silver Nissan Altima with heavy tint arrived at the residence and parked directly in front of the house (Figure 36). Due to the darkness at this time of day, SA ████ could not observe the face of the individual who exited the front passenger seat of the silver Nissan; however, SA ████ observed this individual matched the physical description of Alex WEDDLE.



*(Figure 36)*
*Front passenger of silver Nissan exiting the vehicle as he makes his way towards the front door of 1437 South 71st Street.*

340. The front-seat passenger then ran inside the front door of the residence for approximately one minute before he exited the residence and re-entered the silver Nissan. At approximately 6:45 P.M., the silver Nissan departed.

341. SA ███ then cross-referenced the cell-site location data for 414-627-7500 around the time the silver Nissan was at 1437 South 71st Street. SA ███ observed the "pings" for the mobile device associated with 414-627-7500 traveled from North Milwaukee, WI, to West Allis, WI, prior to the Silver Nissan arriving. SA ███ also observed after the Silver Nissan departed 1437 South 71st Street, the "pings" for the mobile device associated with 414-627-7500 traveled back towards Milwaukee, WI.

342. SA ███ then continued reviewing the cell-site location data for 414-517-5178 and 414-627-7500 and observed at approximately 7:00 P.M., both mobile devices associated with the aforementioned telephone numbers were within the same cell-sector (*area covered by a given cell-tower*), which was near 2519 North 2nd Street, Milwaukee, WI. Please note, SA ███ observed via call detail records that at approximately 7:00 P.M. telephone No. 414-517-5178 had called telephone No. 414-627-7500.

343. Upon observing both mobile devices were in close proximity to 2519 North 2nd Street Milwaukee, WI. SA ███ reviewed the surveillance footage from the pole camera at 2519 North 2nd Street around 7:00 P.M.

344. While reviewing the pole camera footage, SA ███ observed that at approximately 6:52 P.M., a silver Subaru Outback with a handicap tag hanging from the rearview mirror parked on the west side of North 2nd Street, directly next to the apartment complex located at 2519 North 2nd Street. Please note, on January 12, 2022, SA ███ observed Janicia MACK-HOWARD exit the main entrance of 2519 North 2nd Street before she walked over to a silver

Subaru Outback with a handicap tag hanging from the rearview mirror. SA ███ observed the license plate of the vehicle to be WI registration "ANF3993." After this observation, SA ███ queried the registration via WI DOT records and observed the vehicle was registered to Janicia MACK-HOWARD on January 6, 2022. DOT records documented that MACK-HOWARD provided the 1437 South 71st Street, West Allis, WI, as her address.

345.    Continuing the review of the pole camera footage on January 10, 2022, at approximately 7:00 P.M., the Silver Nissan Altima arrived at 2519 North 2nd Street, and parked on the west side of North 2nd Street directly behind the Subaru Outback. At approximately 7:01 P.M., the red Nissan Altima emerged from the apartment's parking lot and parked directly behind the silver Nissan Altima (Figure 37).



*(Figure 37)*
*Vehicles parked on North 2nd Street at approximately 7:01 P.M., from front to back: Black Toyota Corolla (Purple "X"), Silver Subaru Outback (Teal "X"), Silver Nissan Altima (Red "X"), and Red Nissan Altima (White "X").*

346. At approximately 7:02 P.M., a black male, matching the description of Alex WEDDLE, exited the front passenger seat of the silver Altima and approached the red Nissan Altima. After the individual exited, the silver Nissan Altima departed and did not return.

347. At approximately 7:02 P.M., two males, matching the description of Xzayvier WEDDLE and JONES exited the front and rear passenger seats of the red Nissan and greeted the individual suspected to be Alex WEDDLE outside the red Nissan. After the three males met outside, all of them entered the Nissan, which can also be seen in Figure 37.

348. After spending approximately one minute inside the red Nissan, the individual suspected to be Alex WEDDLE exited the red Nissan and began walking towards the silver Subaru; however, he stopped short of the Subaru and turned towards the driver's window of the red Nissan. The individual suspected to be Alex WEDDLE then reached his arm through the driver's window in a manner consistent with an individual passing off an object to the driver of the red Nissan (Figure 38)



*(Figure 38)*
*Individual suspected to be Alex WEDDLE reaching his right arm inside the driver's window of the red Nissan*

349. At approximately 7:03 P.M., after the individual suspected to be Alex WEDDLE

removed his arm from the inside of the red Nissan, he walked over to the silver Subaru and entered the front passenger seat. The silver Subaru then conducted a U-turn and traveled north on North 2nd Street, while the red Nissan simultaneously traveled south on 2nd Street (opposite direction of Subaru).

350.    SA ██ then cross-referenced the cellular "pings" during the time frame of when these vehicles were observed at 2519 North 2nd Street and identified both mobile devices, 414-517-5178 and 414-627-7500, were in the same cell-sector encompassing 2519 North 2nd Street while these events on North 2nd Street took place.

351.    SA ██ then reviewed the cellular "pings" after the meeting at 2519 North 2nd Street occurred.  SA ██ observed that after the individual suspected to be Alex WEDDLE left 2519 North 2nd Street in the silver Subaru, the "pings" for both mobile devices continued to travel in a manner indicative of the mobile devices remaining together. SA ██ understood this to mean the individual suspected to be Alex WEDDLE had given the mobile device associated with 414-627-7500 to an individual inside the red Nissan.

352.    This is further supported by the fact that at approximately 7:30 P.M., the red Nissan arrived at 1437 South 71st Street, West Allis, WI, and parked directly in front of the residence, which was observed via pole camera. When SA ██ cross-referenced the cellular "pings" for both the mobile devices associated with 414-627-7500 and 414-517-5178 at the time the red Nissan arrived at 1437 South 71st Street, both mobile devices were within the cell-sector encompassing 1437 South 71st Street. It should also be noted that Alex WEDDLE was not observed arriving or leaving 1437 South 71st Street while the mobile devices associated with 414-627-7500 and 414-517-5178 were within the vicinity of the residence.

353.    In sum, from the aforementioned observations and cellular location data on January

10, 2022, SA ████ understood these events to be indicative of Alex WEDDLE possessing the mobile device associated with 414-627-7500 prior to 7:02 P.M., which is approximately when the individual matching Alex WEDDLE's physical description provided the mobile device associated with 414-627-7500 to an individual inside the red Nissan Altima.

354.    I know through know information gleaned over the course of this investigation that ADTO members work "shifts." I further understood these events to be indicative of Alex WEDDLE providing other ADTO members with the mobile device associated with 414-627-7500 after Alex WEDDLE had finished selling narcotics on January 10, 2022.

## K.  SURVEILLANCE OPERATION ON JANUARY 21, 2022 – DATE OF NINTH UNDERCOVER PURCHASE – <u>TARGET LOCATION C</u>

355.    On January 21, 2022, at approximately 11:13 A.M., investigators were monitoring the pole cameras at 2519 North 2nd Street, Milwaukee, WI, in real-time. At this time, a black ford sedan bearing WI registration "AMZ9098" parked behind a black Toyota Corolla bearing WI registration "252AGJ," which is a vehicle that has been utilized by the ADTO since November of 2021.

356.    An unknown white male then exited the Ford sedan and walked up to the front passenger seat of the black Toyota.  PEREZ-RAMIREZ, wearing a white sweatshirt and a blue/yellow hat, then exited front passenger seat, allowing the unknown white male to enter the vehicle.

357.    PEREZ-RAMIREZ then approached a white Acura sedan parked directly in front of the black Corolla. PEREZ-RAMIREZ opened the Acura's driver door and proceeded to crawl onto the seat and reach around the front cab.  Approximately 1 minute later, PEREZ-RAMIREZ pulled a State of WI license plate out of the Acura and walked back to the black Toyota.

358.    Approximately 20 seconds after entering the black Toyota, the white male exited

the front passenger seat of the Toyota and reentered the black Ford sedan before driving away. It should be noted that as the first white male exited the Corolla, a different unknown white male walked up to the Corolla from a different vehicle that had parked on North 2nd Street and entered the front passenger seat of the Toyota. The second unknown white male then exited the Corolla approximately 30 seconds later. After the second unknown white male exited, PEREZ-RAMIREZ entered the front passenger seat as he still possessed the license plates taken from the cab of the white Acura.

359.    At approximately 11:20 A.M., a third unknown white male arrived and entered the rear passenger seat of the Toyota. Approximately 2 minutes later the third unknown male exited the black Toyota and drove away in a grey sedan.

360.    At approximately 11:27 A.M., a brown Ford F-150 with temporary vehicle registration in the rear window arrived and parked behind the black Toyota. Lemar HOWZE, wearing black pants, a black hooded sweatshirt, underneath a tan sleeveless zip up vest, then exited the driver seat of the F-150. HOWZE approached the driver's window of the Toyota and appeared to speak to the Toyota's driver, later identified by investigators conducting physical surveillance on North 2nd Street to be Alex WEDDLE. At approximately 11:28 A.M., Alex WEDDLE exited the driver's seat of the Toyota, wearing a puffy black jacket with black pants (Figure 39).


*(Figure 39)*
*HOWZE, left, meeting with Alex WEDDLE (right) after WEDDLE exited the driver's seat of the black Toyota.*

361. At approximately 11:29 A.M., HOWZE and Alex WEDDLE approached the brown F-150. HOWZE then opened the driver's door and reached inside the vehicle and emerged with a State of Wisconsin license plate. HOWZE and Alex WEDDLE then walked around to the passenger side of the truck before HOWZE and WEDDLE returned to the driver door. HOWZE then again reached inside the truck and retrieved a black pistol (Figure 40). HOWZE then placed the pistol in his front waistband before concealing the gun with his sweatshirt.



*(Figure 40)*
*HOWZE retrieving the black pistol (circled in red) prior to concealing the gun in his waistband*

362. At approximately 11:42 A.M., PEREZ-RAMIREZ, Alex WEDDLE, and HOWZE assemble on North 2nd Street and then get into the F-150. Alex WEDDLE entered the driver's

seat, HOWZE entered the front passenger seat, and PEREZ-RAMIREZ entered the rear passenger seat. The F-150 then drove north-bound on 2nd Street before it exited view of the pole camera.

363. At approximately 12:24 P.M., investigators monitoring the pole camera in real-time observed a silver Subaru bearing WI registration "ANF3993", registered to MACK-HOWARD, temporarily parked on 2nd Street, just east of 2519 North 2nd Street. At approximately 12:26 P.M., the Subaru drove north-bound on 2nd Street.

364. At approximately 12:28 P.M., both the aforementioned F-150 and Subaru returned to North 2nd Street. The Subaru parked behind the black Toyota while the F-150 parked across from the Subaru on the west side of 2nd Street.

365. At approximately 12:30 P.M., Alex WEDDLE, HOWZE, and PEREZ-RAMIREZ exited from the same seats of the F-150 they previously occupied. Alex WEDDLE then approached the Subaru with a large paper bag and spoke with the driver, later observed by investigators conducting physical surveillance at the location to be MACK-HOWRD. As Alex WEDDLE met with MACK-HOWARD, PEREZ-RAMIREZ walked towards the white Acura and opened the driver's door with a set of keys. Meanwhile, HOWZE reentered the front passenger seat of the F-150.

366. At approximately 12:31 P.M., Alex WEDDLE handed the brown bag to MACK-HOWARD and then returned to the F-150's driver's seat. PEREZ-RAMIREZ then exited the white Acura and proceeded to enter the driver's seat of the black Toyota, that is still parked behind the Acura on 2nd Street.

367. At approximately 12:34 P.M., a silver Jeep, bearing WI registration "ANS5409" parked behind the F-150 on 2nd Street. A WI DOT check revealed this vehicle, 2003 Jeep Liberty with vin 1J4GL58K23W718931 is registered to a Tyrome Page (B/M; DOB: 10/16/1964).

368.     The driver, an elderly black male wearing a dark-colored suit jacket and pants with a fedora-style hat, entered the front passenger seat of the Toyota, with PEREZ-RAMIREZ in driver's seat.  The elderly black male then remained seated in the Toyota while Alex WEDDLE exited the driver's seat of the F-150.

369.     Alex WEDDLE then approached the driver's door of the Toyota. Alex WEDDLE then stood outside the Toyota and appeared to be speaking with the elderly black male through the open door. After several moments, Alex WEDDLE appeared to hand an item to one of the occupants of the vehicle.  Please note, while WEDDLE interacted with the occupants of the Toyota, HOWZE moved to the driver's seat of the F-150.

370.     After several minutes, the elderly black male exited the passenger seat of the Toyota, walked back to the Jeep, and then entered the Jeep's driver's seat.  The vehicle then drove south on North 2nd Street before leaving the pole camera's field of vision. After the elderly black male exited the Toyota, Alex WEDDLE walked to the passenger side of the Subaru and entered the rear passenger seat.

371.     At approximately 12:35 P.M., OBREGON, who had been in the front passenger seat, exited the Subaru as she carried a black leather backpack in her right hand. OBREGON then approached and entered the front passenger seat of the Toyota.  As OBREGON was doing this, the F-150, which is driven by HOWZE, drove south-bound on North 2nd Street before turning west onto Wright Street, the southern cross street.

372.     At approximately 12:39 P.M., PEREZ-RAMIREZ exited the driver's seat of the Toyota and entered the driver's seat of the white Acura.  At approximately 12:40 P.M., OBREGON exited the front passenger seat of the Toyota carrying a black leather backpack and joined PEREZ-RAMIREZ in the White Acura.

373.    At approximately 12:42 P.M., PEREZ-RAMIREZ backed the Acura to next to driver's side of the Toyota. PEREZ-RAMIREZ then opened the trunks of the white Acura and black Toyota. PEREZ-RAMIREZ then retrieved a grey/black backpack from the trunk of the Toyota and placed several unknown items inside the backpack before he placed the backpack inside the trunk of the white Acura.

374.    PEREZ-RAMIREZ then retrieved a box from the trunk of the Toyota as well as several items from the rear passenger area of the Toyota's cab before he approached the rear passenger seat of the Subaru, which is where Alex WEDDLE still remained. PEREZ-RAMIREZ then handed the items he collected from the vehicles' trunks through the rolled-down rear passenger window.

375.    PEREZ-RAMIREZ then retrieved a red Nike Shoebox from the Toyota and placed it in the Subaru via the rear passenger window before returning to the Toyota to retrieve another red Nike box, which was delivered in the same manner.

376.    PEREZ-RAMIREZ then reapproached the Toyota and proceeded to close Toyota's rear passenger door, which had remained open during his trips between the Toyota and Subaru. PEREZ-RAMIREZ retrieved an additional item from the Toyota before walking back to the Subaru, where he placed the item from the Toyota on top of the Subaru's roof. PEREZ-RAMIREZ then walked away from the Subaru and entered the driver's seat of the Acura before he drove the vehicle, with OBREGON still inside, north on North 2nd Street.

377.    Please note, prior to PEREZ-RAMIREZ departing 2519 North 2nd Street in the white Acura, a Customs and Border Protection (CBP) helicopter was dispatched to the area to surveille the meeting taking place. The helicopter then followed the white Acura as it traveled from 2519 North 2nd Street directly to 1437 South 71st Street, West Allis, WI.

378.    Upon arriving at 1437 South 71st Street, PEREZ-RAMIREZ and OBREGON exited the white Acura. PEREZRAMIREZ then retrieved a grey/black backpack, which was previously observed at 2519 North 2nd Street and other items before entering the residence. Please note, several minutes after the helicopter followed the white Acura to West Allis, the helicopter was directed by Agents coordinating the surveillance to return to 2519 North 2nd Street.

379.    Returning to surveillance at 2519 North 2nd Street, at approximately 12:55 P.M., surveillance personnel observed Alex WEDDLE exit the Subaru, grab the item on the vehicle's roof which was left by PEREZ-RAMIREZ, and place it in the Subaru's rear-hatch. Alex WEDDLE then approached and entered the driver's seat of the Toyota before he departed the area.

380.    At approximately 1:01 P.M., surveillance personnel at 2519 North 2nd Street observed an unknown white male (different than the three previous unknown white males) park a beige Buick with WI registration "KM4905" behind the Subaru, which was now occupied solely by MACK-HOWARD. The unknown white male then entered the front seat of the Subaru and remained there for approximately one minute. The white male then exited, returned to his Buick, and drove off. Through training and experience, I understood the white male's short-term visit with MACK-HOWARD inside the Subaru to be indicative of a hand-to-hand drug deal.

381.    At approximately 1:03 P.M., a maroon Chevy with no license plates arrived at 2519 North 2nd Street and parked behind the Subaru.  MACK-HOWARD then moved the Subaru forward on North 2nd Street and repositioned the vehicle several car-lengths in front of the Chevy. The black Toyota, still driven by Alex WEDDLE, then returned to North 2nd Street and parked behind the Subaru.

382.    At approximately 1:04 P.M., Alex WEDDLE briefly parked the Toyota next to the Subaru's driver's side and appeared to have a conversation MACK-HOWARD.  At approximately

1:05 P.M., an unknown black male exited the driver's seat of the Chevy and entered the front passenger seat of the Toyota.

383.    At approximately 1:07 P.M., the unknown black male then exited the front passenger seat of the Toyota and returned to the Chevy.  The Toyota then departed, driving north on 2nd Street.

384.    Prior to Alex WEDDLE driving away in the Toyota, the CPB helicopter had returned to 2519 N 2nd Street and began following the Toyota. The helicopter followed the Toyota until it arrived near 2529 North Booth Street, Milwaukee, WI, at approximately 1:09 P.M. An unknown male at that location then jogged over to the vehicle and joined Alex WEDDLE inside the Toyota for approximately one minute before the same unknown male exited the Toyota and jogged away from the car.

385.    Alex WEDDLE then drove the Toyota to the intersection of North Booth Street and East Wright Street. At this location, another unknown male walked up to the Toyota's front passenger window and appeared to conduct a hand-to-hand drug transaction with Alex WEDDLE before this unknown male walked away.

386.    The Toyota then returned to 2519 North 2nd Street and parked directly next to MACK-HOWARD in the Subaru. After just a few seconds, the Toyota once again drove off.

387.    The helicopter continued to follow Alex WEDDLE in the Toyota until it drove into an alley behind 2615 North Holton Street, Milwaukee, WI, at approximately 1:27 P.M.. At this location, an unknown individual in a red shirt ran out to the Toyota and entered the front-passenger seat. After approximately one minute, the individual in the red shirt exited the Toyota and walked back towards the rear-door of 2615 North Holton Street. The Toyota then drove off.

388.    Returning to investigators at 2519 North 2nd Street, at approximately 1:19 P.M.,

MACK-HOWARD moved her Subaru to the west side of North 2nd Street, facing south. MACK-HOWARD then exited the Subaru with a small dog and multiple handbags. She then proceeded to walk into the apartment's parking lot before she entered the main entrance of the apartment complex.

389.    At approximately 1:29 P.M., the helicopter lost their visual surveillance of the Toyota due to the Alex WEDDLE's fast and erratic driving. The helicopter was then directed by investigators coordinating the surveillance to cover SA ███ who was coordinating the purchase of narcotics from Alex WEDDLE.

390.    After SA ███ purchased narcotics from Alex WEDDLE (reference section B subsection j), the helicopter again attempted to follow Alex WEDDLE in the Toyota; however, due to Alex WEDDLE's evasive driving, the helicopter lost visual contact with the vehicle approximately five minutes after Alex WEDDLE completed the transaction with SA ███

## L. REVIEW OF OBREGON'S ICLOUD CONTACTS AND COINCIDING CALL DETAIL RECORDS ANALYSIS INCLUDING THE IDENTIFICATION OF 414-215-8866

391.    On November 30, 2021, the Honorable Stephen C. Dries, signed a federal search warrant for the records and information associated with the iCloud (Apple) account belonging to Marisela OBREGON (Marisela.Obregon@icloud.com).

392.    On December 22, 2021, Agents received the requested records from Apple for OBREGON's account. After receiving the records, Agents began reviewing the records and were able to observe OBREGON's iCloud contacts. SA ███ then cross referenced OBREGON's contacts against the call detail records for telephone numbers 414-722-0553, 414-517-5178, 414-627-7500, and 414-839-8056. From the call detail records data, SA ███ identified the following contacts from OBREGON's iCloud account were in contact with 414-722-0553, 414-517-5178,

414-627-7500, and 414-839-8056 at the following frequencies over the provided time ranges:

| Name within OBREGON's iCloud Contacts | Telephone Number | Number of Calls To/From **414-517-5178** |
|---|---|---|
| AJ 🔋 | 414-233-2001 | **44** (06/14/2021-01/26/2022) |
| Carlos Work | 414-517-5178 | **3,714** (7/26/2021-01/26/2022) |
| Carlos😍😒😖❤️ | 414-215-8866 | **169** (5/27/2021-1/18/2022) |
| Pinky | 414-949-2634 | **222** (09/21/2021-01/26/2022) |
| Work Phone 1 | 414-722-0553 | **713** (08/16/2021-11/23/2021) |
| Work Phone 2 | 414-517-5178 | **3,714** (07/26/2021-01/26/2021) |
| Sisssss | 414-839-8056 | **389** (06/12/2021-12/06/2021) |

| Name within OBREGON's iCloud Contacts | Telephone Number | Number of contacts with **414-722-0553** |
|---|---|---|
| AJ 🔋 | 414-233-2001 | **271** (08/15/ 2021-01/23 2022) |
| Carlos Work | 414-517-5178 | **64** (09/19/2021-01/22/2022) |
| Carlos😍😒😖❤️ | 414-215-8866 | **131** (11/23/2021-01/21/2022) |
| Pinky | 414-949-2634 | **370** (08/19/2021-01/26/2022) |
| Work Phone 1 | 414-722-0553 | **1,725** (12/02/2021-01/26/2022) |
| Work Phone 2 | 414-517-5178 | **64** (09/19/2021-01/22/2022) |
| Sisssss | 414-839-8056 | **592** (08/16/2021-12/05/2021) |

| Name within OBREGON's iCloud Contacts | Telephone Number | Number of contacts with **414-627-7500** |
|---|---|---|
| AJ 🔋 | 414-233-2001 | **193** (01/04/2021-01/26/2022) |
| Carlos Work | 414-517-5178 | **313** (04/17/2021-01/24/2022) |
| Carlos😍😒😖❤️ | 414-215-8866 | **166** (05/09/2021-01/18/2022) |
| Pinky | 414-949-2634 | **501** (04/05/2021-01/26/2022) |
| Work Phone 1 | 414-722-0553 | **106** (09/07/2021-01/23/2022) |
| Work Phone 2 | 414-517-5178 | **313** (04/17/2021-01/24/2022) |
| Sisssss | 414-839-8056 | **790** (05/23/2021-11/23/2021) |

| Name within OBREGON's iCloud Contacts | Telephone Number | Number of contacts with **414-839-8056** |
|---|---|---|
| AJ 🔋 | 414-233-2001 | **72** (August 15, 2021 - 11/09/2021) |
| Carlos Work | 414-517-5178 | **498** (06/12/2021-11/23/2021) |
| Carlos😍😒😖❤️ | 414-215-8866 | **249** (05/27/2021-11/08/2021) |
| Pinky | 414-949-2634 | **0** |
| Work Phone 1 | 414-722-0553 | **66** (09/1/2021-01/22/2022) |
| Work Phone 2 | 414-517-5178 | **498** (06/12/2021-11/23/2021) |

| Sisssss | 414-839-8056 | **97** (01/01/2021-08/27/2021) |
|---|---|---|

393.    It is important to note that after Alex WEDDLE was arrested on October 25, 2021, he made recorded telephone calls to MACK-HOWARD from the Milwaukee County Secure Detention Facility (MSDF).  During one call made by Alex WEDDLE to MACK-HOWARD on October 26, 2021, at approximately 5:16 P.M., MACK-HOWARD informed Alex WEDDLE that she had just obtained marijuana from "AJ." I know through training and experience that individuals commonly refer to marijuana as "gas," and often symbolize this slang term with a gas pump emoji (⛽). Per call detail records, 414-839-8056 communicated with "AJ ⛽" (414-233-2001) four times on October 26, 2021, from 4:25 P.M. – 04:51 P.M.

394.    On January 26, 2022, SA ▓▓▓ queried 414-233-2001 via ZetX.com, which is a website available to law enforcement officials that provides the mobile carrier for a given telephone number. ZetX.com identified the mobile carrier as T-Mobile.

395.    Referencing section B subsection i (eighth undercover purchase), I know that MACK-HOWARD is commonly referred to as "Sis." OBREGON's iCloud contact, "Sisssss" is listed under telephone number 414-839-8056.

396.    On January 4, 2022, SA ▓▓▓ contacted Sprint (mobile carrier for 414-839-8056), which was acquired by T-Mobile in April of 2020. SA ▓▓▓ had contacted the mobile carrier after SA ▓▓▓ was notified by the mobile carrier that the telephone number was no longer in service. Please note, SA ▓▓▓ observed via call detail records that 414-839-8056 had not made any outgoing calls or texts after November 24, 2021. SA ▓▓▓ was informed by the mobile carrier that although the number had been changed, the subscriber remained the same. SA ▓▓▓ then reviewed the call detail records and observed telephone number 414-807-4375 began contacting 414-517-5178, 414-722-0553, and 414-627-7500 on November 24, 2021. Since this date, 414-

807-4375 has been in contact with these three numbers a total of 774 times. The three aforementioned numbers are also 414-807-4375's top three most contacted telephone numbers.

397.    On January 14, 2022, Drug Enforcement Agency (DEA) Task Force Officer (TFO) Dwain Monteilh, submitted an administrative subpoena to Sprint for call detail records and subscriber information for 414-807-4375. On January 18, 2022, after receiving the requested information from Sprint, TFO Monteilh provided the records to SA ███ SA ███ observed the listed subscriber for 414-807-4375 was "Janicia HOWARD," who provided Sprint with an address of "2519 North 2nd Street, Apt 4, Milwaukee, WI."

398.    As listed in the previous tables, OBREGON's iCloud contact, "Carlos 😍 😉 😘 💗" is listed under telephone number 414-215-8866. I know from information gleaned over the course of this investigation that PEREZ-RAMIREZ is OBREGON's romantic partner.

399.    On January 26, 2022, SA ███ reviewed the call detail records data and identified 414-215-8866 has contacted 414-517-5178, 414-722-0553, and 414-627-7500 a total of 305 times since May 9, 2021, with 87 of these contacts occurring since January 1, 2022. On January 26, 2022, SA ███ queried this number via ZetX.com and identified the mobile carrier for 414-215-8866 is AT&T, which is the same mobile carrier utilized by OBREGON (414-690-4086).

**M. IDENTIFICATION OF XZAYVIER WEDDLE'S TELEPHONE NUMBER: 920-304-9969**

400.    On January 9, 2022, the Honorable Judge Nancy Joseph authorized a search warrant for Facebook accounts 100039395971081 and 100043838067731 belonging to Xzayvier WEDDLE.

401.    During review of the records for the aforementioned accounts, SA ███ observed a Facebook Messenger conversation between Xzayvier WEDDLE's account 100039395971081 and a Facebook account with the vanity name "Quazanae Wilson" that occurred on November 18,

2021. During the conversation, Xzayvier WEDDLE askes "Quazanae Wilson" to have "trel" call him (Xzayvier WEDDLE). Xzayvier WEDDLE then provides his telephone number as "920-304-9969.".

402.   On January 26, 2022, SA ███ queried "920-304-9969" within call detail records from 414-517-5178, 414-722-0553, and 414-627-7500. The call detail records data revealed 920-304-9969 has contacted the three aforementioned numbers a total of 78 times since November 1, 2021. In the last 30 days, 920-304-9969 has contacted 414-517-5178, 414-722-0553, and 414-627-7500 a total of 19 times.

403.   On January 26, 2022, SA ███ queried "920-304-9969" via ZetX.com, which identified the mobile carrier as Cricket Wireless, which is a subsidiary of AT&T.

## N.  TELEPHONES UTILIZED BY THE ADTO

404.   During the investigation, case agents have identified several telephones used by the ADTO for drug customers and communicating between members of the ADTO.  As of today date, case agents have not been able to identify all telephones utilized by the ADTO or the ADTO's source of cocaine. Through my training and experience, I know that ADTO often utilized multiple cellphones in order to communicate with different participants of the organization and drug costumers.  Information obtained regarding TARGET LOCATION A, B, and C (TARGET LOCATIONS) in this search warrant will assist case agents to identified additional telephones being utilized by the ADTO.  Based on the facts set forth in this affidavit, I believe that additional unidentified electronics are being used in furtherance of violations 21 U.S.C. §§ 841 and 846, and by Alex WEDDLE, Carlos PEREZ-RAMIREZ, Janicia MACK-HOWARD, Marisela OBREGON, Xzayvier WEDDLE, Gerald JONES, Lemar HOWZE, and other identified and unidentified subjects and  that there is probable cause to believe that the information outlined in

Attachment B regarding the TARGET LOCATIONS will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

405.

## III.    JURISDICTION

406.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  Specifically, the United States District Court for the Eastern District of Wisconsin is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## IV.    TECHNICAL BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY

407.    Based on my training and experience, I know that cellular devices, such as mobile telephone(s), are wireless devices that enable their users to send or receive wire and/or electronic communications using the networks provided by cellular service providers.  Using cellular networks, users of many cellular devices can send and receive communications over the Internet.

408.    I also know that many devices, including but not limited to cellular devices, have the ability to connect to wireless Internet ("wi-fi") access points if the user enables wi-fi connectivity.  These devices can, in such cases, enable their users to send or receive wire and/or electronic communications via the wi-fi network.  A tablet such as an iPad is an example of a device that may not have cellular service but that could connect to the Internet via wi-fi.  Wi-fi access points, such as those created through the use of a router and offered in places like homes, hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions as the name of the wi-fi network.  In general, devices with wi-fi capability routinely scan their environment to determine what wi-fi access points are within range and will display the names of

networks within range under the device's wi-fi settings.

409.    Based on my training and experience, I also know that many devices, including many cellular and mobile devices, feature Bluetooth functionality.  Bluetooth allows for short-range wireless connections between devices, such as between a device such as a cellular phone or tablet and Bluetooth-enabled headphones.  Bluetooth uses radio waves to allow the devices to exchange information.  When Bluetooth is enabled, a device routinely scans its environment to identify Bluetooth devices, which emit beacons that can be detected by devices within the Bluetooth device's transmission range, to which it might connect.

410.    Based on my training and experience, I also know that many cellular devices, such as mobile telephones, include global positioning system ("GPS") technology.  Using this technology, the device can determine its precise geographical coordinates.  If permitted by the user, this information is often used by apps installed on a device as part of the apps' operation.

411.    Based on my training and experience, I know Google is a company that, among other things, offers an operating system ("OS") for mobile devices, including cellular phones, known as Android.  Nearly every device using the Android operating system has an associated Google account, and users are prompted to add a Google account when they first turn on a new Android device.

412.    In addition, based on my training and experience, I know that Google offers numerous apps and online-based services, including messaging and calling (e.g., Gmail, Hangouts, Duo, Voice), navigation (Maps), search engine (Google Search), and file creation, storage, and sharing (e.g., Drive, Keep, Photos, and YouTube).  Many of these services are accessible only to users who have signed in to their Google accounts.  An individual can obtain a Google account by registering with Google, and the account identifier typically is in the form of a Gmail address (e.g.,

example@gmail.com).   Other services, such as Maps and YouTube, can be used with limited functionality without the user being signed in to a Google account.

413.    Based on my training and experience, I also know Google offers an Internet browser known as Chrome that can be used on both computers and mobile devices.  A user has the ability to sign-in to a Google account while using Chrome, which allows the user's bookmarks, browsing history, and other settings to be uploaded to Google and then synced across the various devices on which the subscriber may use the Chrome browsing software, although Chrome can also be used without signing into a Google account.  Chrome is not limited to mobile devices running the Android operating system and can also be installed and used on Apple devices and Windows computers, among others.

414.    Based on my training and experience, I know that, in the context of mobile devices, Google's cloud-based services can be accessed either via the device's Internet browser or via apps offered by Google that have been downloaded onto the device.  Google apps exist for, and can be downloaded to, devices that do not run the Android operating system, such as Apple devices.

415.    According to my training and experience, as well as open-source materials published by Google, I know that Google offers accountholders a service called "Location History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain a record of the locations where Google calculated a device to be based on information transmitted to Google by the device.  That Location History is stored on Google servers, and it is associated with the Google account that is associated with the device.  Each accountholder may view their Location History and may delete all or part of it at any time.

416.    Based on my training and experience, I know that the location information collected by Google and stored within an account's Location History is derived from sources including GPS

data and information about the wi-fi access points and Bluetooth beacons within range of the device. Google uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data. Google records the margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a "maps display radius," for each latitude and longitude point.

417. Based on open-source materials published by Google and my training and experience, I know that Location History is not turned on by default. A Google accountholder must opt-in to Location History and must enable location reporting with respect to each specific device and application on which they use their Google account in order for that usage to be recorded in Location History. A Google accountholder can also prevent additional Location History records from being created at any time by turning off the Location History setting for their Google account or by disabling location reporting for a particular device or Google application. When Location History is enabled, however, Google collects and retains location data for each device with Location Services enabled, associates it with the relevant Google account, and then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google Maps is used, and to provide location-based advertising. As noted above, the Google accountholder also has the ability to view and, if desired, delete some or all Location History entries at any time by logging into their Google account or by enabling auto-deletion of their Location History records older than a set number of months.

418. Location data, such as the location data in the possession of Google in the form of its users' Location Histories, can assist in a criminal investigation in various ways. As relevant here, I know based on my training and experience that Google has the ability to determine, based

on location data collected and retained via the use of Google products as described above, devices that were likely in a particular geographic area during a particular time frame and to determine which Google account(s) those devices are associated with. Among other things, this information can indicate that a Google accountholder was near a given location at a time relevant to the criminal investigation by showing that his/her device reported being there.

419. Based on my training and experience, I know that when individuals register with Google for an account, Google asks subscribers to provide certain personal identifying information. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, this information often provide clues to their identity, location, or illicit activities.

420. Based on my training and experience, I also know that Google typically retains and can provide certain transactional information about the creation and use of each account on its system. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, Google often has records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP

address information can help to identify which computers or other devices were used to access the account.

## V. AUTHORIZATION REQUEST

421. Based on the foregoing, I submit that there is probable cause to search information that is currently in the possession of Google and that relates to the devices that reported being within the Target Locations described in Attachment A during the time period described in Attachment A for evidence of the crimes under investigation. The information to be searched includes (1) identifiers of each device; (2) the locations reported by each device to Google and the associated timestamp; and (3) basic subscriber information for the Google account(s) associated with each device.

422. The proposed warrant sets forth a multi-step process whereby the government will obtain the information described above. Specifically, as described in Attachment B Section I:

   a) Using Location History data, Google will identify those devices that it calculated were or could have been (based on the associated margin of error for the estimated latitude/longitude point) within the Target Locations described in Attachment A during the time period described in Attachment A. For each device, Google will provide a unique device ID assigned by Google and its location coordinates along with the associated timestamp(s), margin(s) of error for the coordinates (*i.e,.* "maps display radius"), and source(s) from which the location data was derived (*e.g.*, GPS, wi-fi, bluetooth), if available. Google will not, in this step, provide the Google account identifiers (*e.g.,* example@gmail.com) associated with

the devices or basic subscriber information for those accounts to the government.

b) The government will identify to Google the devices appearing on the list produced in step 1 for which it seeks the Google account identifier and basic subscriber information. The government may, at its discretion, identify a subset of the devices.

c) Google will then disclose to the government the Google account identifier associated with the devices identified by the government, along with basic subscriber information for those accounts.

423. This process furthers efficiency and privacy by allowing for the possibility that the government, upon reviewing contextual information for all devices identified by Google, may be able to determine that one or more devices associated with a Google account (and the associated basic subscriber information) are likely to be of heightened evidentiary value and warrant further investigation before the records of other accounts in use in the area are disclosed to the government.

424. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

425. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

426. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with

the Service Provider's services, including by initiating a signal to determine the locations of the Target Cell Phones on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

427.    Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phones outside of daytime hours.

V.    **CONCLUSION**

428.    Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c).

429.    I further request that the Court direct Google to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

This warrant is directed to Google LLC and applies to:

(1) Location History data, sourced from information including GPS data and information about visible wi-fi points and Bluetooth beacons transmitted from devices to Google, reflecting devices that Google calculated were or could have been (as indicated by margin of error, *i.e., "*maps display radius") located within the geographical region bounded by the latitudinal and longitudinal coordinates, dates, and times below ("Initial Search Parameters"); and

(2) Identifying information for Google Accounts associated with the responsive Location History data.

**Initial Search Parameters (TARGET LOCATIONS)**

**First Time-Frame and Location (TARGET LOCATION A):**

- Date: January 10, 2022

- Time Period: 07:01:30 P.M to 7:02:59 P.M.

- Target Location: Geographical area identified as:



**Geofence points for search warrant:**

Point 1: 43.064586, -87.912563

Point 2: 43.064586, -87.912670

Point 3: 43.063973, -87.912670

Point 4: 43.063973, -87.912563

**Second Time-Frame and Location (TARGET LOCATIONS B):**

- Date: January 21, 2022

- Time Period: 2:18:00 P.M. – 2:21:00 P.M.

- Target Location: Geographical area identified as:



**Geofence points for search warrant:**

Point 1: 43.022834, -87.947984

Point 2: 43.022834, -87.948091

Point 3: 43.022700, -87.948091

Point 4: 43.022700, -87.947984

**Third Time-Frame and Location (TARGET LOCATION C):**

- Date: January 21, 2022

- Time Period: 12:29:15 P.M. to 12:32:59 P.M. (CST)

- Target Location: Geographical area identified as:



**Geofence points for search warrant:**

Point 1: 43.064406, -87.912503

Point 2: 43.064406, -87.912742

Point 3: 43.063973, -87.912742

Point 4: 43.063973, -87.912503

I.      **Information to be disclosed by Google**

The information described in Attachment A, via the following process:

1.      Google shall query location history data based on the Initial Search Parameters specified (*three different time-frames and locations*) in Attachment A.  For each location point recorded within the Initial Search Parameters, and for each location point recorded outside the Initial Search Parameters where the margin of error (*i.e.*, "maps display radius") would permit the device to be located within the Initial Search Parameters, Google shall produce to the government information specifying the corresponding unique device ID, timestamp, location coordinates, display radius, and data source, if available (the "Device List").

2.      The government shall review the Device List and identify to Google the devices about which it seeks to obtain Google account identifier and basic subscriber information.  The government may, at its discretion, identify a subset of the devices.

3.      Google shall disclose to the government identifying information, as defined in 18 U.S.C. § 2703(c)(2), for the Google Accounts associated with each device ID appearing on the Device List about which the government inquires.

II.      **Information to Be Seized**

All information described above in Section I that constitutes evidence of violations of 21 Title 21, United States Code, Sections 841, 846 and 856 have been committed by Alex WEDDLE, Carlos PEREZ-RAMIREZ, Janicia MACK-HOWARD, Marisela OBREGON, Xzayvier WEDDLE, Gerald JONES, Lemar HOWZE, and other identified and unidentified subjects.